**A. J. WHIPPLE and Mildred Whipple, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 18963.**

United States Court of Appeals Fifth Circuit.

April 4, 1962.

Rehearing Denied May 11, 1962.

Charles Dillingham, Ben H. Schleider, Jr., Houston, Tex., for petitioners.

William A. Friedlander, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, R. P. Hertzog, Acting Chief Counsel, John M. Morawski, Sp. Atty., I. R. S., Robert M. Anderson, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, Chief Judge, and HUTCHESON and RIVES, Circuit Judges.

TUTTLE, Chief Judge.

The taxpayer-petitioners here complain of the decision of the Tax Court which held that the taxpayers' advances to the corporation, in which the husband held a majority interest, represented, within the meaning of Section 23(k) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 23(k) a non-business rather than a business bad debt, when these advances became worthless upon the insolvency of the corporation. So far as is significant here a non-business bad debt is defined in the statute as one "other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." The debt which the petitioner claims he should be allowed to deduct as a business bad debt represents the balance of unpaid advances which Whipple had made to Mission Orange Bottling Company, a soft drink bottling company, in which he owned approximately 80% of the stock and of which, at the time of the debt becoming worthless, he had assumed the active management because of its unsuccessful operation thus far. The final advance of $48,000 was made by taxpayer to Mission Orange coincidentally with its transfer to him of its entire physical assets on December 15, 1953. This left his unrecovered claim against Mission Orange at $56,975.10. It is conceded that this amount became worthless during the month of December, 1953.

The Tax Court, based on ample evidence, found that during the period of four years commencing in 1949, petitioner was instrumental in incorporating fifteen corporations; fourteen of these were engaged in construction, building or real estate business; petitioner owned an interest in five additional construction or real estate corporations, and at one time or another was a member of ten partnerships involved in similar activities; during this period of time the petitioner spent the major part of his time and energies in the construction or real estate business, or the related building supply business; on April 25, 1951, petitioner obtained a franchise from the Mission Dry Corporation entitling him to

produce, bottle, distribute and sell Mission Beverages in certain counties in Texas; during the same month he purchased the bottling machinery and equipment then owned by one D. C. Casey, who was operating the Mission Orange Company in Lubbock, Texas; he conducted this business as a sole proprietorship until approximately July 1, 1951, at which time he organized debtor corporation, Mission Orange Bottling Company, and transferred the bottling machinery and equipment to it; the bottling business was apparently not successful, for during the years 1952 and 1953, he made advances to it so that including the amount which the corporation owed him as the result of his sale of the bottling assets, it was indebted to him in the sum of $79,489.06, on December 1, 1953. On December 15th petitioner advanced Mission Orange $48,000 to pay general creditors, and on the same date he received a transfer from Mission Orange of bottling machinery, equipment and an automobile, which had the value of $70,414.66. This left a net amount due by Mission Orange to him of $56,975.10, which the Tax Court found became worthless during the month of December, 1953.

The Tax Court, in its opinion, stated:

"If we were required to find a definite time of worthlessness we should be inclined to say December 15, 1953, at which time petitioner received the bottling machinery from Mission Orange in partial satisfaction of that corporation's obligation."

Thus it appears that at the time when the sum of $48,000 of the indebtedness in issue was advanced to Mission Orange petitioner had no hope of its being recovered.

Petitioner recognizes the usual rule that where the controlling stockholder of a corporation is unable to obtain repayment of moneys he advances to his corporation to bolster up its operating possibilities this is generally considered a non-business bad debt. This follows because in such a case the loan or advance made by the taxpayer to the corporation is no part of any business which he is engaged in individually. It is an advance or loan made by him to enable his wholly owned corporation to make a profit. The petitioner here, however, contends that his extensive activity in the formation of the numerous corporations and the extensive activity he himself performed in attempting to save the Mission Orange Company in its operation, made these particular advances loans in some separate trade or business carried on by the taxpayer.

The Tax Court made the following findings of fact:

"Petitioner was not in the business of organizing, promoting, managing or financing corporations in 1953. He was not in the business of lending money in that year."

In its opinion the Tax Court also determined that taxpayer was not personally in the business of bottling and selling soft drinks at the time he made the advances that resulted in the debt here in issue.

In the case of Giblin v. Commissioner, 5 Cir., 227 F.2d 692, this Court said:

"We recognize the fact that the question whether the activities of a taxpayer constitute carrying on a trade or business is largely one of fact, the solution of which 'requires an examination of the facts in each case.' Higgins v. Commissioner of Internal Revenue, 312 U.S. 212, 217, 61 S.Ct. 475, 478, 85 L.Ed. 783. The findings of the Tax Court or the District Court, therefore, are normally critical on this issue."

The Giblin case is one in which this Court found that under the peculiar circumstances which were there present a taxpayer could treat a loss, resulting from the failure of his wholly or partially owned corporations to repay advances, as a business bad debt. In articulating the circumstances which justified a finding of the existence of a business bad debt, we said:

"Taxpayer did not seek to show that he was engaged in the business

of making loans. Neither did he seek to have the Tax Court 'pierce the corporate veil' and find that he was engaged in the restaurant business or in any of the other businesses which he had promoted and dealt with during the preceding twenty years. What he did seek to prove was that he was regularly engaged in the business of seeking out business opportunities, promoting, organizing and financing them, contributing to them substantially 50% of his time and energy and then disposing of them either at a profit or loss * * *."

We further stated:

"Petitioner's right to deduct the amount of the cancelled debt depends not upon his showing, as the Tax Court seemed to think, that he was in the business of lending money, but rather that he was regularly engaged in the business of 'dealing in enterprises,' during the course of which he operated either as a proprietor, as a stockholder, as a partner or as a lender or in a combination of these capacities, contributing to each enterprise his own initiative and energy, and such financial backing as it required."

We think that the Tax Court was amply warranted in finding that there was no evidence in this record, other than the simple fact that taxpayer had used his talents as a building contractor to organize a large number of companies to conduct such building operations, that he was interested in any way in doing any more than enabling these separate corporations to achieve a successful and lucrative operation as corporations. Taxpayer's claim, it seems clear to us, falls within the class of those in which the taxpayer fails to recognize the distinction between carrying on one's business through a corporate form, which of course, requires some organizing and financing, and the business of dealing in corporations, which may likewise require some financing arrangements. As stated

by the Court of Appeals for the Ninth Circuit in Holtz v. Commissioner of Internal Revenue, 256 F.2d 865, at page 870:

"Where the former is the situation, it is hornbook law, and not contested by petitioner, that the corporate entity is the primary debtor and stockholder loans to protect his investment or increase its value do not create a separate business for the stockholders. As the Fifth Circuit recently said in distinguishing the Giblin case, supra, 'Petitioner was not engaged in the business of dealing in enterprises.' Pokress v. C. I. R., 5 Cir., 1956, 234 F.2d 146, 150 note 12. Nor did the Tax Court, nor do we, find him so engaged here. The finding of the Tax Court is binding upon us unless clearly erroneous. Here, it is not."

This opinion then cited the case of Burnet v. Clark, 287 U.S. 410, where at page 415, 53 S.Ct. 207, at page 208, 77 L.Ed. 397, the Supreme Court said:

"[The taxpayer] was not regularly engaged in indorsing notes, or buying and selling corporate securities. The unfortunate indorsements were not part of his ordinary business, but occasional transactions intended to preserve the value of his investment in capital shares."

The case of Ferguson v. Commissioner, 4 Cir., 253 F.2d 403, is equally persuasive of the correctness of the Tax Court's decision here. In that case it was said, "It is now well settled that debts such as these are not deductible as business bad debts unless the taxpayer is so extensively engaged in the business of promoting or financing business ventures as to elevate that activity to the status of a separate business." 253 F.2d 403, 406.

So far as relates to the petitioner's contention that he was engaged in the separate business of lending money, we think that the Tax Court's finding that the relatively small number of interest bearing loans made by the taxpayer did not constitute a separate business en-

gaged in by him. Furthermore, we think it was certainly within the ability of the Tax Court to find as a fact that the particular advances made to the Mission Orange Company, especially the $48,000 advanced on the date on which it stripped itself of all of its physical assets, were not made in the course of a separate business conducted by the taxpayer. We certainly cannot find that this determination by the Tax Court was clearly erroneous.

The decision of the Tax Court is

Affirmed.

HUTCHESON, Circuit Judge (dissenting).

The sole question for decision in this case is whether the $56,975.10 debt of Mission Orange Bottling Company of Lubbock, Inc. to petitioner, A. J. Whipple, was a business bad debt or a non-business bad debt within the meaning of Sec. 23(k) (1) or Section 23(k) (4), respectively, Internal Revenue Code of 1939. I am unable to agree with the opinion of the majority, and, for the reasons hereinafter stated, I dissent.

It was stipulated: (1) that it was a debt; and (2) that it became worthless in 1953.

The answer to the question turns on whether or not the loss resulting from the debt's becoming worthless did or did not bear a proximate relationship to the conduct of a business in which petitioner Whipple was engaged at the time the debt became worthless.

The taxpayer is here insisting that the tax court below and the government in its brief and on oral argument have failed to recognize and give effect to the fact that, though taxpayer's activities which gave the debt rise might not lend themselves to a specific name or label, they were certainly of a business nature within the meaning and intent of the act, in that the petitioner engaged in them for the purpose of deriving income therefrom, and the bad debt loss suffered had a direct relationship to the conduct of these business activities.

I agree with these views. While the act is loosely drawn and has the fault of a negative approach to definition, that is, seems to be more concerned with stating what is not, than with what is, a business debt, we think that the language of the statute and regulation involved [1] and its legislative history [2] shows

1. *Internal Revenue Code of 1939:*
   "§ 23. Deductions from gross income.
   "In computing net income there shall be allowed as deductions:
   *    *    *    *    *
   [As amended by Sec. 124(a), Rev.Act of 1942, c. 619, 56 Stat. 798] (k) Bad debts.—
   "(1) General rule.—Debts which become worthless within the taxable year; *  *  *. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. *  *  *
   *    *    *    *    *
   "(4) Non-business debts.—In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as

defined in paragraph (3) and other than a debt *  *  * the worthlessness of which is incurred in the taxpayer's trade or business. *  *  *"
(26 U.S.C. 1952 ed. Sec. 23)
*"Treasury Regulations 118* (1939 Code):
   "Sec. 39.23(k)—6. Non-business bad debts. (a) *  *  *
   "(b) The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a prominate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a non-business debt for the purposes of this section."

2. As the House of Representatives Report No. 2333, 77th Congress, First Session,

that the intent was not to deny a business bad debt deduction under the facts presented in this case.

I think, too, that the tax court, the Commissioner, and the majority opinion of this court have erred when, instead of relying on the language and legislative history of the act, they have placed their reliance on the gloss which has been put on the statute by various and sundry decisions cited by them which have construed this remedial statute so narrowly as practically to defeat its remedial purpose.

The language of the act and its legislative history both show that congress, desiring to encourage risk taking with respect to loans incurred in connection with business and to discourage the making of loans for use taxwise to kinsmen or friends, gave favorable tax treatment to bad debts arising out of, or in connection with business ventures, while denying such treatment to purely personal bad debts or those where other than business considerations motivated the

lending. I think that the purpose of the statute was, and is, not advanced and the remedy is completely defeated when the mischief the statute was designated to meet is dropped entirely out of consideration, as in the board's decision here, in some of the decisions the board relies on, and in the majority opinion.

In the beginning of the interpretation of the statute and its application, the decisions were not so at fault. In the very first year of the applicability of Sec. 23(k) (4), 1943, the question of how proximate the relationship of the debt to a business of the taxpayer must be was raised and decided in the case of Robert Cluett, 3rd, et ux v. Commissioner, 8 T.C. 1178 (1947). In that case the taxpayer sold a one-fourth ownership in a stock exchange seat for $125,000 and took a note from the purchaser for $65,-000. The purchaser subsequently went bankrupt, leaving $28,985.97 owing on the note. The taxpayer deducted this sum as a business bad debt and the court allowed it as such.[3]

states in regard to the Revenue Act of 1942, at page 409 of Cumulative Bulletin 1942–2:

"The present law gives the same tax treatment to bad debts incurred in non-business transactions as it allows to business bad debts. An example *of a non-business bad debt would be an unrepaid loan to a friend or relative, while business bad debts arise in the course of the taxpayer's trade or business.* This liberal allowance for non-business bad debts has suffered considerable abuse through taxpayers making loans which they do not expect to be repaid. This practice is particularly prevalent in the case of loans to persons with respect to whom the taxpayer is not entitled to a credit for dependents. The situation has presented serious administrative difficulties because of the requirement of proof." (emphasis added)

The Senate Committee Reports contain no further explanation of the purpose for the insertion of the subsection which became 23(k) (4).

The relationship which the loan must have to a taxpayer's business was explained in the House Committee Report on page 431 of C.B. 1942–2 where it quoted from Treasury Regulation 118, as shown in note 1, above, and then went on

to give illustrations of debts which were incurred in what was obviously a business transaction to show how the time of the debt's becoming worthless would control in determining its proximate relationship to the taxpayer's business.

3. In allowing this as a business bad debt, the court said:

"The principal contention of the respondent seems to be that the loss from the bad debt in question did not arise in the ordinary course of the operation of a business involving the buying and selling of stock exchange seats. The petitioner does not contend that he was regularly engaged in any such business. Neither does he contend that the loss in question was one sustained in a usual transaction of any partnership of which he was a member. He contends, however, that the loss resulted directly from the operation of the business in which he was regularly engaged, both at the time the sale was made and at the time the debt became worthless, and, in the alternative, that the loss was at least proximately related to or connected with the business. * * *"

"*The legislative history of Sec. 23(k) (4) indicated that its principal purpose was to place a limitation upon losses*

It is significant to note that the Treasury Department acquiesced in this interpretation of the statute, 1942–2 CB (2).

The next case to pass on the meaning of Sec. 23(k) (4) was that of Campbell v. Commissioner, 11 T.C. 510 (1948), involving the taxable year 1944. The three petitioners in the Campbell case had been engaged since 1929 in organizing, owning and operating corporations (in total 12) engaged in the retail coal business. It was their practice as a part of their business to advance to (or leave with) those corporations on open account money belonging to them in many different instances. One of those corporations was the Campbell Bros. Coal Co. of Akron. The loans to that company which were in question were similar to loans made to others of their companies. The court, in determining that the loss resulting from such worthlessness was a business bad debt, denied the government's claim that taxpayer's loss fell under Section 23(k) (4).[4]

The commissioner also acquiesced in this case, decided in 1948, 1949–1 CB(1).

The Treasury's acquiescence in the Cluett and Campbell cases has never been withdrawn, and they still stand as the basic interpretative decisions on the statute.

The taxpayer in the Cluett case was certainly not in the business of selling stock exchange seats, and Mr. Campbell was not in the business of selling coal companies. Yet the government contends, and the tax court and the majority have erroneously held, that in order for the loss to be deductible, taxpayer Whipple must show that the numerous corporate enterprises which he promoted, financed, and managed were formed by him for sale. This extension of the restriction on the qualification of business bad debts contended for by commissioner and tax court considerably restricts the remedy which Congress provided for curing the mischief it had in mind. I think it clear that such restriction was never contemplated by Congress. Indeed the contention pressed here emasculates a clearly intended remedial law.

Looking at the question in the light of the language of the act and its legislative history, I am in no doubt that the tax court was wrong in citing and relying on cases to the contrary of these views for such a restrictive and defeating construction.

I am also of the opinion that the great weight and number of the decided cases [5]

---

from bad debts, such as loans to relatives or friends which had no connection with the business of the lender. * * * (Emphasis supplied)

"The debt here in question was not the result of a loan by the petitioner to a friend or relative or an isolated transaction which bore no relation whatsoever to the business in which he was engaged, but, on the contrary, was closely related to the business of owning and using a stock exchange membership for the production of income, in which business the petitioner was engaged not only in 1929, when the debt was created, but also in 1943, when it became worthless. * * * "

4. The court said: " * * * They were debts, the loss from the worthlessness of which was incurred in the taxpayer's business. A finding has been made that they were business rather than nonbusiness bad debts, because the evidence shows that they had a direct connection with the business carried on by these petitioners, and the losses were directly the result of, and incurred in, the business of *organizing and operating corporations engaged in the retail coal business, which business of organizing and operating such corporations was carried on by the petitioners during the taxable year. These are not cases in which losses of corporations are being confused with losses of individuals or in which the business of a corporation is being confused with the business of individuals.* Nor are they like net loss carry-over cases in which the loss occurred in isolated transactions rather than in the operation of a business. * * * " (Emphasis added)

5. Giblin v. Commissioner, 5 Cir., 227 F.2d 692; Maytag v. United States, Ct.Cl., 289 F.2d 647; Trent v. Commissioner, 2 Cir., 291 F.2d 669; Maloney v. Spencer, 9 Cir., 172 F.2d 638; Sage v. Commissioner, 15 T.C. 299; Foss v. Commissioner, 5

and the strength of their reasoning support petitioner's view. The case of Giblin v. Commissioner, note 5, supra, decided by this court, carefully and correctly construed and applied the statute and gave it a construction and application which the petitioner contends for and is entitled to here.

It seems to me that the basic fault of the majority opinion is in holding, as it in effect does, that business bad debt treatment must be denied the taxpayer here because the loan was to a corporation in which he was interested. This holding is, in my opinion, a clear addition to the taxing statute. If Congress had so intended, it could and would have so provided. Not having done so, neither the tax court nor this court can construe the statute as though it contained such provision.

Cir., 75 F.2d 326; Commissioner of Internal Revenue v. Stokes Estate, 3 Cir.,

200 F.2d 637; Scott v. Commissioner, 14 TCM 1029.