H. H. BODZY and Marjorie Bodzy et al., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 20148.

United States Court of Appeals
Fifth Circuit.

July 10, 1963.

R. B. Cannon, Fort Worth, Tex., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Crane C. Hauser, Chief Counsel and John M. Morawski, Atty., I.R.S., Karl Schmeidler, Robert N. Anderson, Martin B. Cowan, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, Chief Judge, and RIVES and MOORE,* Circuit Judges.

---

\* Of the Second Circuit, sitting by designation.

1. We shall use the term "advances" to include all of the deductions sought by petitioners. However, most of these "advances" were in the form of paying off Thermal's creditors under guaranties of Thermal's purchases from them. It is not clear in what form the remaining advances were made, but it does appear that all of the parties, and the Tax Court, treated them similarly, for the record indicates that the "advances" were made in order to pay Thermal's creditors,

TUTTLE, Chief Judge.

This is a petition to review a decision of the Tax Court holding certain payments made by petitioners on behalf of their corporation not deductible during the tax year 1954.

With the exception of petitioner Snowden (and wife), the taxpayers-petitioners were members of the partnership of Texas Crude Company (some of the petitioners are parties by reason of filing joint returns), the main activities of which were in various aspects of the oil business. However, the partnership, through its managing partner, Ted Weiner, not a party to these proceedings, and Snowden, formed, operated and financed several businesses in unrelated fields, one of which was Thermal Control, Inc., a company which operated solely as a dealership in air conditioning equipment. It is "advances"[1] made by the taxpayers to Thermal Control with which we are concerned in these tax proceedings. The taxpayers sought, under different theories, to deduct these "advances" made to Thermal under various provisions of §§ 165 and 166 of the Internal Revenue Code of 1954, for the taxable year 1954.

From the very beginning to its demise, a period of four years, Thermal Control was a failure. Thermal was formed with a capital of $10,000 by Snowden and Ted Weiner, the latter always acting for the partnership of Texas Crude in regard to Thermal's operations and financing. Snowden and Texas Crude each owned one-half of the stock in Thermal. One

when Thermal was unable to meet its obligations.

This treatment seems justified in light of Putnam v. Commissioner, 352 U.S. 82, 92, 77 S.Ct. 175, 179, 1 L.Ed.2d 144, where the Supreme Court said, "There is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed bank loan." However, the Tax Court in the case at bar held that all of these so-called "advances" were contributions to capital rather than loans to the corporation. This is one of the questions with which we deal in this opinion.

Blankenship was Thermal's manager, who, during the latter stages of Thermal's unsuccessful existence, was given the authority to purchase a number of air conditioning units from Remington Corporation, with Snowden and the partnership acting as guarantors of all the trade acceptances evidencing these purchases.

The business of Thermal was in such financial straits at that time, 1954, that none of Thermal's creditors would extend credit without the guaranties of its owners, the taxpayers herein. In the summer of 1954 Thermal defaulted on these trade acceptances and taxpayers were called upon to make good their guaranties. They did so, and the amounts they were called upon to pay to Remington on these guaranties were in excess of $400,000. During the period from November 1953 to September 1954 Snowden and the partnership advanced to Thermal, either in the form of direct payments to Remington under the guaranties or in the form of advances to Thermal to satisfy its debts to other creditors,[2] a total of $546,138, divided equally between Snowden and Texas Crude, the partnership. Neither the record nor briefs discloses exactly how that portion of the $546,138, other than the payments to Remington, was advanced to Thermal. However, it does appear that all of the advances to Thermal, whether in the form of direct payments under guaranty or in advances to Thermal, were made for the purpose of paying off Thermal's creditors in order to keep Thermal from sinking to deeper insolvency and final dissolution, which purpose was not fulfilled. We will thus treat all of the advances similarly. See Whipple v. C. I. R., infra. Other pertinent facts will be disclosed in the discussion of each of taxpayers' contentions.

2. See fn. 1.

3. "§ 166. Bad debts
   "(a) General Rule.—
   "(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

The Tax Court found in favor of the Commissioner on all of the grounds urged by taxpayers.

█ Taxpayers' main contention is that these advances to Thermal were business bad debts deductible in 1954 as ordinary losses under § 166(a) (1) or (2) [3] of the 1954 Code as debts incurred in the taxpayers' trade or business of organizing or financing corporations and other business ventures.

Whipple v. C. I. R., 801 F.2d 108 (5th Cir. 1962), Aff'd., 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963), clearly disposes of taxpayers' contention here. In Whipple taxpayer set up several corporations, one of which was Mission Orange, a bottling company in which taxpayer had an 80% interest and managed its operation. He made several advances to the corporation in order to pay its general creditors, as well as having originally sold the assets to the corporation for which it was still partially indebted to him. When the corporation dissolved and transferred back to him its assets it still owed him $56,975 net from the exchange of the assets and the advances made to it by the taxpayer. This court held that the loss sustained by taxpayer fit under § 166(d), as a non-business bad debt, and could not be deducted as a bad debt sustained in the trade or business of taxpayer of operating and financing corporations. This court said:

"' * * * the taxpayer fails to recognize the distinction between carrying on one's business through corporate form, which of course, requires some organizing and financing, and the business of dealing in corporations, which may likewise require some financing arrangements." 301 F.2d at 110.

"(2) Partially worthless debt.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

The Supreme Court, on affirming, said in order to sustain a finding that taxpayer is engaged in a trade or business of financing corporations it must be found that the taxpayer had an intention of "developing the corporations as going businesses for sale to customers in the ordinary course * * *." 373 U.S. at 203, 83 S.Ct. at 1174. The Court importantly pointed out that it made no difference how many corporations the taxpayer financed or managed. If he actively engaged in serving them as his own corporations for the purpose of creating future income through those enterprises, he is no different from the owner of one corporation who advances money to it.

■ We do not need to delve further into the facts of this case with respect to the activities of the taxpayers in promoting these enterprises, for the essential ingredient of a determination of such a trade or business announced by this court and the Supreme Court in Whipple is here missing, viz., there is *no* evidence that taxpayers intended to develop the corporations as going businesses for sale to customers in the ordinary course. All the evidence supports the finding of the Tax Court below that the debts arose from "activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business." Whipple, ibid.[4]

We must next determine if the advances of taxpayer to Thermal and payments under the guaranties were nonbusiness bad debts or merely contributions to capital as found by the Tax Court.[5] A second related question is: in what year may the worthless security losses under § 165(g) or nonbusiness bad debts under § 166(d) be taken as deductions, depending on whether we affirm the Tax Court's finding that all of the advances were contributions to capital or hold to the contrary that the advances were loans.

Upon finding that the advances were contributions to capital, the Tax Court then found that the taxpayers' stock did not become "wholly worthless" [6] in 1954, but only in 1956 when the final payment in liquidation was made to Thermal Control's stockholders.

We hold that the Tax Court erred as to its finding that the advances and payments made under taxpayers' guaranties were contributions to capital. We hold that they were bona fide nonbusiness debts. Although in support of its finding that the "advances" were contributions to capital, the Tax Court found that the advances were made proportionate to the stock ownership of the taxpayers in Thermal, were not evidenced by any note or security, did not have a fixed date for repayment, and did not provide interest, we do not see how these advances and guaranty payments made under the circumstances of this case can be construed as capital contributions. Undisputed testimony of the principals was that taxpayers had "no knowledge of the execution by Thermal of trade acceptances for purchases of air conditioning units until after the nonpayment" by Thermal,

4. The taxpayers do not, and could not, urge that the losses sustained by them could be taken as ordinary losses under § 165(a) and (c) (2) which allows a deduction for losses incurred in a transaction entered into for profit, though not connected with a trade or business. Putnam v. Commissioner, 352 U.S. 82, 77 S. Ct. 175, 1 L.Ed.2d 144, does not allow a debt situation to be treated under the loss provisions of § 165. The Court felt that Congress, when it amended § 166 in 1942 with subsection (d), which restricted the section as it had previously stood, did not intend to give bad debts ordinary loss treatment when incurred in a transaction entered into for profit, but intended that to get ordinary loss treatment the debt must be incurred in a trade or business of the taxpayer. See also Whipple v. Commissioner, supra.

5. The difference in the results of either finding would be that nonbusiness bad debts are deductible as short-term capital losses, whereas, if it is a capital contribution, the loss would be taken through the worthless stock provision, § 165(g), and the loss from worthless securities would be treated as long or short term according to the length of time the securities were held.

6. Treas.Reg. § 1.165–5(c).

which nonpayment led to the taxpayers' payments of over $400,000 to Remington under their guaranties. How, then, could it be said that they knew or intended that the corporation needed some $500,000 more capital than they had paid in? It appears that the remaining payments or "advances" to Thermal were similar to those which were made directly to Remington. They were made so that Thermal could pay off its creditors, because without their knowledge, they became obligated to do so by conduct of their manager who created a wholly unexpected obligation for them to discharge. Such payments on the part of the taxpayers, the greater portion of them involuntary, made in order to pay off their corporation's debts, cannot be said to be contributions to capital, in spite of the other findings of the Tax Court, stated above, which would ordinarily lend support to a finding of capital contributions.

■ We also find that these nonbusiness bad debts may not be deducted in 1954 for, although the corporation had ceased doing business in 1954, there was evidence of some assets remaining in Thermal, although small when compared with the debt [7] of Thermal to taxpayers, distributed to the taxpayers-stockholders in 1955 and 1956,[8] and under § 166(d) no deduction is allowed for partially worthless debts. The debts must become "totally worthless." Treas.Reg. § 1.166–5 (a) (2): "No deduction shall be allowed for a nonbusiness debt which is recoverable in part during the taxable year."

■■ The Tax Court, after it found that the payments were contributions to capital, found that the stock had not become "wholly worthless" in 1954 under § 165(g). We affirm this latter finding of fact, but with respect to the worthless-

ness of the debt, not the stock. This court said in Miami Beach Bay Shore Co. v. C. I. R., 136 F.2d 408, 5th Cir., that stock has not become worthless until "the last vestige of value has disappeared." Since the provisions of the Internal Revenue Code should be interpreted similarly where similar language is used in related code provisions, *compare* § 165(g), Treas.Reg. § 165–5(c), *with* § 166(d), Treas.Reg. § 1.166–5(a) (2), we think that the "last vestige of value" must also disappear before a nonbusiness bad debt may be deducted. This Treas. Regulation appears to be a reasonable interpretation of § 166, since § 166 allows *partially* worthless business debts to be deducted, but denies a deduction for *partial* worthlessness of nonbusiness bad debts. In light of this we are unable to allow the deduction in 1954 even though the greater portion of taxpayers' debts to their corporation appeared almost surely lost.

■ The final question for determination is whether the taxpayers can take a theft loss deduction under § 165(e) [9] because of the acts of Blankenship, the manager. The claim was that he had overpurchased air conditioning equipment by forging or altering purchase orders, on which taxpayers were guarantors by contract with Remington, at a time when the business of Thermal was losing and sales of such equipment were poor. Such conduct, claim the taxpayers, led to the losses sustained by them.

Such allegations and the proof offered in support thereof do not sustain a claim of theft loss. As found by the Tax Court there was no proof of criminal intent on the part of Blankenship, the manager. Nor was there any proof that Blankenship himself reaped any benefits from these overpurchases. There ap-

7. We are treating the debt of Thermal to its shareholders as one separate debt since the advances and payments under the guaranties were made on an open account basis, with no evidence of any recognition of separate debts.

8. On three separate occasions after the close of the taxable year 1954 Thermal made payments in liquidation to the tax-payers, amounting respectively to the sums of $12,000, $2,700 and $400. The final payment was made in 1956.

9. § 165(e) reads, "Theft losses.—For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss."

**336**

pears to be no more than allegation of poor business judgment on his part. This does not approximate theft.

The decision of the Tax Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.