TEJON RANCH COMPANY AND SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tejon Ranch Co. v. Commissioner
Docket No. 11844-81, 26167-82.
United States Tax Court
T.C. Memo 1985-207; 1985 Tax Ct. Memo LEXIS 424; 49 T.C.M. (CCH) 1357; T.C.M. (RIA) 85207; April 30, 1985. Norman B. Barker and Robert A. Rizzi, for petitioners. Martin D. Cohen and Charles W. Jeglikowski, for respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1972
$742,943
1973
1,048,380
1974
847,728
1975
990,888
1976
474,806
1977
888,088
1978
176,152
*425 After concessions, the issues are (1) whether petitioners are entitled to deductions for worthless debts under section 166[1] with respect to two loans made to a certain limited partnership and (2) whether petitioners are entitled to a deduction for a loss under section 165 with respect to their investment in a certain limited partnership. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners, Tejon Ranch Company and Subsidiaries, (herein "petitioners") are corporations having a principal place of business in Lebec, Calif. For each of the years in issue, petitioners filed consolidated Federal income tax returns on a calendar-year basis using the accrual method of accounting. Petitioner Tejon Ranch Company (herein "TRC") was incorporated in 1936 and is a publicly-held corporation with approximately *426 1,300 shareholders. Its stock is traded on the American Stock Exchange. TRC owns over 265,000 acres of farm land located primarily in Kern County, Calif., between Los Angeles and Bakersfield, on which it operates an active cattle ranch and farming business. TRC is also involved in other commercial activities including real estate development and oil exploration and extraction. Petitioner, Tejon Agricultural Corporation (herein "TAC"), a wholly owned subsidiary of TRC, was formed on March 3, 1972, to serve as the general partner of Tejon Agricultural Partners (herein "TAP"). TAP was formed on or about April 27, 1972, as a California limited partnership, in order to develop approximately 21,000 acres of TRC's land into a new agricultural operation for the production of wine grapes, almonds, walnuts, citrus fruits, figs, vegetables, and other crops. The 21,000 acres of farm land were first transferred by TRC to TAC, and then, in turn, contributed by TAC to TAP. The respective deeds of conveyance reserve to TRC all mineral rights in the land and provide that upon the termination of TAP's existence in 1997, title to the land will revert back to TRC. This reversion, however, is subject *427 to the claims of TAP's creditors. In 1972, limited partnership interests in TAP were offered to the public. TAP's initial capitalization consisted of the farm land which TAC had contributed which had a fair market value of approximately $13,690,000 and cash of $19,005,000, representing TAC's contribution of $3,000,000 plus the limited partners' contributions totalling $16,005,000. [3] At the time of TAP's formation, it was anticipated that an additional $2,880,900 of cash would subsequently be contributed by the limited partners pursuant to a provision in TAP's partnership agreement. [4] This amount was in fact paid by the limited partners in 1974, and as of the close of that year, the total of all partners' capital contributions to TAP was $35,576,500. [5]
*428 At the time of its formation, TAP has obtained an advance ruling from the Internal Revenue Service indicating that TAP would be treated as a partnership for tax purposes. The ruling was based in part, on petitioners' representations that TAC would maintain a net worth at least equal to 10 percent of the amount of all partners' contributions to TAP. Since TAP's total capitalization was expected to be $35,576,500, TAC needed to maintain a net worth of at least $3,557,650. In order to enable TAC to meet this condition, on August 14, 1972, TAC received from TRC a promissory note for that amount payable by TRC to TAC on demand. As will be discussed later, TAC exercised its rights pursuant to the promissory note and obtained $3,557,650 from TRC in 1977 so that it could loan this amount to TAP which was then in financial difficulty (herein referred to as the "obligatory net worth loan"). In order to help finance its initial operations, TAP obtained two loans, one from the John Hancock Life Insurance Company (herein "Hancock") and one from Citibank, N.A. (herein "Citibank"). Hancock agreed to loan TAP a total of $27,000,000, at an interest rate of 8.75 percent.[6] This loan was evidenced *429 by a note and secured by a deed of trust dated August 7, 1972, which gave Hancock a security interest in TAP's land and future crops. Under its loan agreement with TAP, Citibank agreed to extend a line of credit of up to $2,000,000 for working capital and a revolving credit loan of $5,700,000 for working capital with an adjustable rate of interest. [7]
As the time of TAP's formation, TAP agreed to pay an annual guaranteed land use fee to TAC and an annual managment fee to TRC. However, TRC and TAC had agreed to loan back to TAP any *430 amounts previously received by them either in the form of management fees, guaranteed land use fees, or otherwise, if needed, to meet the working capital needs of TAP. Any such loans made by TRC and TAC were to be subordinated to all other obligations of TAP in the event of bankruptcy or liquidation and were on a priority equal with return of capital contributions by TAC and the limited partners. [8]
Because TAP needed additional capital in 1976, TRC and TAC loaned back to TAP $2,826,585 representing a portion of the total amounts they had received as guaranteed land use fees and management fees (herein referred to as the "loan back loan"). The parties executed three promissory notes to reflect the loan back loan. [9] The principal of these notes was to be repaid on July 1, 1978, with the stated interest due quarterly. However, each note provided that, at TAP's option, the note would be renewable upon maturity for successive periods of one *431 year or less through December 31, 1980, provided such funds were reasonably required by TAP to meet its working capital needs and were not reasonably available from other sources. Through the end of 1975, TAP was a financially viable partnership. However, beginning in early 1976, TAP's financial condition began to deteriorate. At that time, revised financial projections showed that TAP's cash requirements would far exceed both original projections and available funds. Accordingly, during 1976 TRC asked Ernst & Ernst (herein "Ernst"), its outside auditors, to assist in studying the future cash needs and profitability of TAP. Based on forecasted balance sheets through 1985 which analyzed TAP's total assets, liabilities, partners' capital, and projected net income (revenue minus expenses), Ernst concluded that TAP could not survive without an additional $20 million of capital. TAP's needs for additional cash in 1976 and thereafter were due to lower revenues and higher expenses than those projected at the time of the 1972 public offering. Because *432 of TAP's deteriorating financial condition in 1976, TAP stopped making the guaranteed land use payments to TAC in July 1976, and the management fee payable to TRC was discontinued in December 1976. During 1976, in order to alleviate its cash shortage, TAP attempted to secure further financing from various sources, including Hancock and Citibank, as well as Tenneco West, which had an agricultural division engaged in similar farming operations. Hancock refused TAP's request for a $5 million increase in its loan with a deferral of the repayment schedule. Citibank also refused to make any further loans to TAP. After investigating TAP's properties in 1976, Tenneco West concluded that the properties had no value since it would take a significant amount of cash to bring TAP's crops to maturity. However, even after the crops reached maturity, Tenneco West believed that TAP would still not be profitable nor would it ever be able to pay the existing debts on the properties. The independent auditors of TRC and TAC refused to issue an unqualified opinion as to the financial statements of those companies for 1976 unless the loans to and investments in TAP were written off. The management *433 of TRC and TAC agreed with their auditors that these amounts should be written off for financial purposes in 1976. [10] Thus, the loan back loan was also written off for tax purposes in 1976. Although the obligatory net worth loan was written off for financial purposes in 1976, it was not in fact advances to TAP until 1977 and therefore was not written off for tax purposes until 1977. During 1977 TAP made several attempts to secure additional financing from various parties including Tenneco West, Getty Oil, and Superior Oil, all of which had agricultural divisions nearby conducting farming activities similar to TAP's. As in 1976, Tenneco West again concluded that there was already too much debt on TAP's properties so that, even when all of the crops reached maturity, the cost optimistic result would be that the debt owing to Hancock could be repaid. Getty was not interested in making any investment in TAP because it felt TAP was unable to carry any additional debt load and because of excessive water costs on TAP's property. Thus, Getty *434 believed that TAP was worthless in 1977. Finally, several employees of Superior Oil gathered information and data related to TAP's operations to determine its viability. They also concluded that Superior should not make any investment in TAP because TAP was worthless in 1977. In July 1977, TAC and TRC retained a financial consulting firm, Boettcher & Company, from Denver, Colorado (herein "Boettcher"), to analyze and attempt to meet TAP's financial needs. In a report dated July 20, 1977, two members of Boettcher's staff made several recommendations to alleviate TAP's financial problems. The report determined that primarily because the original capitalization of TAP was developed based on price assumptions for the crops which did not materialize, the cash flow from TAP's operations was insufficient to service the existing debt structure in both the short and long term. Additional problems included immature crops, excessive water costs, and high overhead. The report proposed several ways that TAP could attempt to meet its financial needs, including partial liquidation of certain properties, a rearrangement of existing debt obligations, and new equity investments in TAP. After *435 considering the report, TAP began to sell off some of its property while it continued its efforts to secure additional equity of $20,000,000. On March 25, 1977, TAC commenced the advancement of funds to TAP pursuant to the obligatory net worth loan in order to provide working capital for TAP's farming operations. By May 31, 1977, TAC had advanced to TAP $3,557,650 (the total amount of the loan) which was evidenced by a promissory note. [11] The entire amount of the obligatory net worth loan was written off by TRC and TAC in 1977 as a worthless debt. By the end of 1977, TAP had an aggregate negative cash flow of $67,000,000, which was $13,000,000 higher than had originally been projected. TAP's attempts to secure additional financing had been unsuccessful. Exclusive of liabilities owing to *436 TRC and TAC, TAP had approximately $41,000,000 of debts and liabilities outstanding as of December 31, 1977. In the later part of 1977, Hancock retained a financial consultant to analyze TAP's financial condition. He concluded that TAP was in serious financial difficulty and that it was doubtful that TAP would ever be able to repay its loan from Hancock. In February 1978, TAP ran out of operating funds and was therefore unable to pay its liabilities including the interest on its outstanding loans. At this time, TAP informed Hancock, its primary secured creditor, of the situation. Hancock considered foreclosing on TAP's property but feared that foreclosure would only cause TAP to file for bankruptcy, which would result in additional costs and impede Hancock's ability to preserve TAP's properties. Thus, Hancock initially decided to keep TAP in existence by advancing funds to TAP in order to preserve its collateral so that it could minimize its losses prior to any future liquidation or dissolution. Soon after providing funds, Hancock decided to take over TAP's operations and to restructure TAP's debt. Accordingly, on February 22, 1978, TAP, Hancock, and Citibank entered into *437 an agreement which restructured TAP's existing loans from Hancock and Citibank. Pursuant to this agreement, Hancock agreed to fund TAP's operations through additional secured priority loans until January 31, 1979, and thereafter only at Hancock's option. [12] In addition, TAP was required under this agreement to distribute any money it received to Hancock and to Citibank. Thus, by the end of 1978, substantially all of TAP's assets were pledged to Hancock and Citibank as collateral, and Hancock was only obligated to fund TAP's operations for one more month. [13]
*438 On their 1976 consolidated Federal income tax return, petitioners deducted the entire amount ($2,826,585) of the loan back loan as a worthless debt under section 166, and, on their 1977 consolidated return, petitioners deducted the entire amount ($3,557,650) of the obligatory net worth loan as a worthless debt under section 166. In his notice of deficiency, respondent determined that petitioners were not entitled to worthless debt deductions for those years. Petitioners contest respondent's determination and also claim a refund for overpayment of taxes due to their failure to claim a loss deduction of $3,156,000 under section 165 for their worthless investment in TAP. [14]
OPINION The first issue is whether petitioners are entitled to deductions for worthless debts under section 166 for both the loan back loan and the obligatory net worth loan during any of the years in issue. Section 166(a) provides as a general rule that a deduction shall be allowed for any debt which becomes worthless within the taxable years. [15] The determination of worthlessness *439 of a debt within a given taxable year depends upon the facts and circumstances for the case. Estate of Pachella v. Commissioner,37 T.C. 347, 353 (1961), affd. 310 F.2d 815 (3d Cir. 1962); Dallmeyer v. Commissioner,14 T.C. 1282, 1291-1292 (1950). This issue must be decided based upon a consideration of all the relevant evidence as to the financial condition of the debtor. Sec. 1.166-2(a), Income Tax Regs.; Riss v. Commissioner,478 F.2d 1160, 1166 (8th Cir. 1973). A debt is deemed totally worthless when there is no longer any reasonable ground for believing that any repayment will be made. Dallmeyer v. Commissioner,supra.In other words, the debt is worthless when it has lost its "last vestige of value." Bodzy v. Commissioner,321 F.2d 331, 335 (5th Cir. 1963). This usually entails proof of the existence of identifiable events which demonstrate the valuelessness of the debts and justify abandonment of any hope of recovery. Crown v. Commissioner,77 T.C. 582, 598 (1981); Riss v. Commissioner,supra.Moreover, *440 a taxpayer need not be "an incorrigible optimist." United States v. White Dental Co.,274 U.S. 398, 403 (1927). *441 Petitioners cite the following facts to support their argument that the loan back loan became worthless in 1976. Based on the state of TAP's operations in 1976, revised financial projections showed that TAP's cash requirements would far exceed original projections as well as available funds. Furthermore, relying on the report prepared by Ernst & Ernst, TAP determined that it needed an additional $20,000,000, and attempts to obtain that cash investment were unsuccessful in 1976. Finally, the independent auditors of TRC and TAC refused to issue an unqualified opinion as to the financial statements of those companies for 1976 unless both loans and the investment in TAP were written off as worthless. Although we agree that TAP's financial condition had deteriorated in 1976, there was no reason at that time for petitioners to abandon all hope of recovering the loan back loan. The record is clear that additional investments would have improved TAP's financial condition.In fact, subsequent to 1976, petitioners continued to make concerted efforts to find additional financing, evidencing the fact that they had not then abandoned hope of recovery. Thus, we conclude that the loan back *442 loan was not worthless at the end of 1976. Petitioners' next argument is that both the loan back loan and the obligatory net worth loan became worthless by the end of 1977. Petitioners rely on the fact that throughout that year TAP made several efforts to secure additional financing from Tenneco West, Getty Oil, and Superior Oil, but none of those companies were willing to invest in TAP due to the excessive amount of debt existing on its properties. These companies believed that, at best, when TAP's crops reached maturity, only Hancock, the primary creditor, would be repaid. Respondent argues that both loans were not worthless in 1977, citing the following factors. During 1977, TAP had not defaulted on any principal indebtedness and was not in bankruptcy or receivership. In addition, the Boettcher report of July 20, 1977, stated that even with all of its then current financial problems, TAP would be able to repay its debts in future years if prices and yields on crops became favorable and if TAP liquidated some of its properties and secured additional financing. Although TAP was in financial difficulty by the end of 1977, we do not conclude that either loan became worthless *443 during that year. Since TAP was not yet in default on any indebtedness at that time, there was still some possibility that TAP could secure additional financing from other sources. In addition, TAP had begun to sell off some of its properties to raise additional cash. Thus, we do not find in 1977 an identifiable event to justify abandonment of any hope of recovery, and we conclude that petitioners were not entitled to worthless debt deductions in 1977. Petitioners' next argument is that both loans became worthless in February 1978 when TAP ran out of operating funds. Respondent, however, contends that since TAP had not liquidated or gone into bankruptcy, there was no identifiable event to justify abandoning all hope of recovery. For the following reasons, we conclude that both the loan back loan and obligatory net worth loan became worthless in 1978. In February 1978, TAP ran out of operating funds and was therefore unable to pay its liabilities including interest on its outstanding loans. At this time, Hancock considered foreclosing on TAP's property but feared that foreclosure would only cause TAP to file for bankruptcy, which would result in additional costs and impede *444 Hancock's ability to preserve TAP's properties. Thus, Hancock initially decided to keep TAP in existence by advancing funds in order to preserve its collateral so that it could minimize its losses prior to any future liquidation or dissolution. Soon after providing additional funds to keep TAP operating, Hancock decided to take over and restructure TAP's operations through additional secured priority loans until January 31, 1979, and thereafter only at Hancocok's option. In addition, TAP was required under the restructuring agreement with Hancock and Citibank to distribute any money it earned or any money received from land sales to Hancock and to Citibank. Thus, by the end of 1978, substantially all of TAP's assets were pledged to Hancock and Citibank as collateral and Hancock was only obligated to fund TAP's operations for one more month. Thus, we find that TAP's running out of operating funds and Hancock's taking over its operations in 1978 were the identifiable events which demonstate the worthlessness of both the loan back loan and the obligatory net worth loan. Although TAP did not liquidate or go into formal bankruptcy in 1978, it is clear that it was Hancock's decision *445 to keep TAP in existence temporarily so that Hancock could minimize its losses. Thus, petitioners were justified at that time in abandoning any hope of ever recovering the amounts loaned to TAP. Accordingly, petitioners are entitled to worthless debt deductions for both loans under section 166 in 1978. The second issue is whether petitioners are entitled to a loss deduction under section 165 for their capital contributions to TAP totalling $3,125,000. Section 165(a) generally provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. A taxpayer is entitled to an ordinary loss deduction under section 165 if his investment in a partnership becomes worthless.[16]Horner v. Commissioner,35 T.C. 231, 236 (1960); Webb v. Commissioner,23 T.C. 1035, 1037 (1955); see also Zeeman v. United States,275 F.Supp. 235, 253 (S.D.N.Y. 1967), affd in part and remanded on other issues, 395 F.2d 861 (2d Cir. 1968). A loss of this type is deductible *446 in the year it is sustained. Webb v. Commissioner,supra.In order to be deductible under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, which show the year in which such a loss was sustained. Sec. 1.165-1(b), Income Tax Regs.
Petitioners argue that their investment in TAP became worthless at the same time that their loans became worthless and therefore they are entitled to a deduction in that year. Respondent argues, however, that petitioners are not entitled to a deduction under section 165 because there are no closed and completed transactions, such as dissolution or liquidation, showing that petitioners sustained such a loss during any of the years in issue. [17] Based on our findings concerning the first issue herein, it is clear *447 that petitioners did not sustain a loss on their capital contributions to TAP in 1976 because attempts were still being made to obtain additional capital. Similarly, for the reasons previously stated, we do not find any closed and completed transactions in 1977 to warrant an ordinary loss deduction under section 165. We do conclude, however, that petitioners' investment in TAP became worthless in February 1978. As we stated earlier, TAP then ran out of operating funds and Hancock decided to contribute additional funds only to minimize its own losses prior to any future liquidation. Although TAP did not go into formal bankruptcy, liquidation, or dissolution, it is clear that TAP was insolvent beyond any hope of rehabilitation by the end of 1978. See Zeeman v. United States,supra at 253. *448 Thus, we find that TAP's hopeless insolvency during 1978 was the closed and completed event in 1978 to justify a deduction for a worthless partnership investment under section 165. Accordingly, we conclude that petitioners sustained a deductible ordinary loss on their investment in TAP in 1978. To reflect concessions and the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioners raised this issue at trial, without an amendment to the pleadings, pursuant to an agreement to that effect between the parties.↩
3. TAC's basis in the farm land contributed to TAP was $156,000. ↩
4. This assessment was pursuant to a provision in TAP's partnership agreement which stated that, in addition to $1,000 per unit subscribed for, each limited partner may be assessed between June 30, 1973, and December 31, 1974, an amount not to exceed $200 per unit. The assessment was $180 for each of the 16,005 limited partnership units. ↩
5. We note that, although our calculations do not agree, the parties stipulated that the total of all partners' capital contributions to TAP was $35,576,500.↩
6. Pursuant to the loan agreement with Hancock, TAP was required to pay the interest quarterly beginning on October 1, 1972. The principal of the loan was required to be repaid in annual installments beginning with a $500,000 payment on January 1, 1979 and ending with a $1,562,500 payment on January 1, 1997. ↩
7. Pursuant to the loan agreement with Citibank, TAP was required to pay back $2,000,000 of the outstanding principal on January 1, 1979, (or such lesser amount as was necessary to repay in full the unpaid principal), and on January 1, 1980, the amount necessary to repay in full any unpaid principal amount of all advances made by Citibank.↩
8. TAC received from TAP an annual guaranteed land use fee of $1,500,000 from 1972 until June 30, 1976. In addition, TRC received from TAP management fees of $1,067,900 in 1972 and $748,000 for each year thereafter until the end of 1976.↩
9. The notes were for $2,000,000, $600,000 and $226,585, bearing interest of 8-1/4 percent, 8-1/2 percent, and 8 percent, respectively.↩
10. TAC's investment of $3,156,000 was written off for financial purposes in 1976, but was not deducted from petitioners' 1976 income tax.↩
11. The promissory note stated an interest rate of 122.5 percent of the prime interest rate in effect at the Crocker National Bank in Los Angeles, Calif. The note also stated that unless demand is made prior thereto, all accrued interest was payable on July 1, 1984, and quarterly on each October 1, January 1, April 1, and July 1, thereafter, until the principal sum of the note is paid.↩
12. All of the money Hancock contributed to TAP for the preservation of its secured interest in TAP's land and crops constituted loans to TAP at 10 percent interest per annum, repayable on January 31, 197. ↩
13. We think it is appropriate to point out that the attorneys for both parties in this case were at odds with each other and of little help to the Court beginning with pretrial conference calls and ending with their briefs. Counsels' conduct interrupted every stage of the Court's proceedings. While counsel on brief expended much effort in continuing their verbal battle with each other, they failed to spend enough time making detailed proposed findings of fact. Moreover, both parties made proposed findings which were unsupported by the record. Thus, the Court had to spend a great deal of time sifting through approximately one hundred lengthy documents in order to determine the relevant facts. We expect that when these attorneys appear before the Court in the future they will conduct themselves in a more professional manner.↩
14. See n. 2, supra.↩
15. Respondent makes a preliminary argument that the two loans in question did not constitute bona fide indebtedness, but were really capital contributions to TAP. In resolving the debt versus equity question, this Court has expressly stated that, while several factors must be considered, the ultimate question is "was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did not that intention comport with the economic reality of creating a debtor-creditor relationship?" Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 494 (1980), quoting Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 377 (1973). Having considered the record herein, we find that petitioners' intention was to create a bona fide debt and that a debtor-creditor relationship existed. Thus, we conclude that the loan back loan and obligatory net worth loan constituted bona fide debts under sec. 166. See sec. 1.166-1(c), Income Tax Regs. We note further that even if these amounts were capital contributions rather than indebtedness, we would conclude, based on our second holding herein, infra, that petitioners would be entitled to a loss deduction under sec. 165↩.
16. Although an interest in a limited or general partnership is a capital asset, a loss resulting from the worthlessness of the interest is not a capital loss, since the statutory requirements of a sale or exchange are not satisfied. See secs. 1222, 741; see also Gannon v. Commissioner,16 T.C. 1134↩ (1951).
17. Respondent argues on brief that since TAC did not sell or exchange its interest in TAP and since TAP was neither liquidated nor dissolved, petitioners are not entitled to any type of loss deduction. However, our conclusion herein under sec. 165↩ is based on our specific finding of whether or not TAC's partnership interest became worthless in one of the years in issue. See n. 16.