MILLEDGE L. MIDDLETON AND ESTATE OF LEONE S. MIDDLETON, DECEASED, MILLEDGE L. MIDDLETON, EXECUTOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13937–79.    Filed August 10, 1981.

---

*Robert M. Fink*, for the petitioners.
*Mark W. Nickerson*, for the respondent.

OPINION

NIMS, *Judge*: In the statutory notice of deficiency, respondent determined deficiencies in petitioners' income tax for the years 1975 and 1976 in the respective amounts of $2,770.07 and $2,312.07. On June 17, 1980, this Court granted respondent leave to file an amendment to his answer, and, as a result, the deficiencies for 1975 and 1976 were increased to $3,895.30 and $3,924.15. The issues for decision are: (1) Whether petitioners' partnership sustained losses upon each mortgage foreclosure of 5 tracts of land or upon an earlier abandonment of the properties; and (2) whether these losses are ordinary or capital.

All of the facts have been stipulated. The stipulation and attached exhibits are incorporated herein by reference.

Petitioners Milledge L. Middleton and Leone S. Middleton resided in Decatur, Ga., at the time the petition in this case was filed. Leone S. Middleton died on November 14, 1979. A motion to substitute the Estate of Leone S. Middleton, deceased, Milledge L. Middleton, executor, as a petitioner herein was subsequently granted.

During 1975 and 1976, Milledge and Leone Middleton (referred to hereinafter as petitioners) were class A limited partners in the Madison, Ltd., partnership (Madison). Madison was organized on September 7, 1973, as a Georgia limited partnership for the purpose of acquiring certain tracts of land as investment property. Madison kept its books and reported its income for tax purposes on the cash basis.

On November 8, 1973, Madison purchased a tract of land consisting of 125.803 acres (referred to hereinafter as parcel 2, tract 1) for a total purchase price of $440,310.50. Madison paid $88,062.10 in cash and took the property subject to a mortgage in the amount of $352,248.40. Because of various capitalized expenses, Madison's basis in this tract was $446,133.68.

On November 8, 1973, Madison acquired 690.812 acres of

land upon which was situated a small building. This parcel consisted of the following 5 tracts:

| Tract | Acreage |
|---|---|
| Tract 1 (hereinafter parcel 1, tract 1) | 54.071 |
| Tract 2 (hereinafter parcel 1, tract 2) | 334.486 |
| Tract 3 (hereinafter parcel 1, tract 3) | 0.985 |
| Tract 4 (hereinafter parcel 1, tract 4) | 300.270 |
| Tract 5 (hereinafter parcel 1, tract 5) | 1.0 |
| | 690.812 |

The building was located on parcel 1, tract 2. The total purchase price for this property was $1,537,056.68. Madison paid $307,411.33 in cash and took the property subject to three existing mortgages and three nonrecourse purchase-money notes, together totaling $1,229,645.35. As a consequence of various capitalized expenditures, Madison's total basis in the property was $1,562,615.60. Of this basis, $51,000 was allocated to the aforementioned building. The remaining basis was allocated among the various tracts as follows:

| | |
|---|---|
| Parcel 1, tract 1 | $190,379.34 |
| Parcel 1, tract 2 | 706,628.44 |
| Parcel 1, tract 3 | 2,080.89 |
| Parcel 1, tract 4 | 611,540.64 |
| Parcel 1, tract 5 | 986.29 |

On August 31, 1973, Madison purchased a tract of land consisting of 765.035 acres (referred to hereinafter as parcel 2, tract 2). The total purchase price was $1,696,791.75. Madison paid $229,588.88 in cash and took the property subject to three existing mortgages totaling $768,203.89, as well as nonrecourse purchase-money notes totaling $698,998.98. Madison's basis in this tract was $1,717,228.61.

On September 21, 1973, Madison purchased 198.791 acres of land (referred to hereinafter as parcel 2, tract 3) on which was situated a house, for a total purchase price of $357,823.80. Madison paid $89,455.95 in cash and took the property subject to a $268,367.85 mortgage. The property's basis, $362,316.56, was allocated as follows:

Tract of 157.381 acres ..........................$284,470.92
Tenant house ..................................... 3,000.00
Tract of 41.41 acres ............................ 74,845.64

Madison acquired all of the above-mentioned property for investment purposes. Consequently, all of the properties were capital assets in the hands of Madison. All of the liabilities relating to the properties were nonrecourse.

### 1973 and 1974

Madison retained ownership of all of the property during 1973 and 1974 and made the required property tax and mortgage payments. However, during the recession of 1974–75 real estate values in Georgia decreased drastically. Because a substantial portion of each tract's purchase price was financed by way of nonrecourse purchase-money notes and existing nonrecourse mortages, the outstanding balances of the nonrecourse liabilities consequently exceeded the fair market values of many of the properties.

### 1975

On May 6, 1975, Madison held a partnership meeting to discuss the impact of the recession on its property holdings. At the meeting, it was determined that the outstanding mortgage balances for the following 3 tracts (or portions thereof) exceeded their respective fair market values: 252 acres of parcel 1, tract 4; all of parcel 2, tract 2; and 157.381 acres of parcel 2, tract 3 (including the house). It was decided that attempts would be made to obtain any available releases from mortgage lien to which the partnership was entitled because of prior mortgage payments, and to renegotiate, if possible, the terms of the purchase-money notes. It was also decided that in the event renegotiation proved fruitless, deeds in lieu of foreclosure would be preferred to the mortgagees so that Madison could relinquish ownership of the properties.

Although Madison was successful in obtaining a mortgage release as to 41.41 acres of parcel 2, tract 3, the partnership was otherwise unsuccessful in persuading the various mortgagees to either renegotiate the terms of the mortgages or to accept deeds in lieu of foreclosure on the remaining tracts. Madison expected to obtain a release for 48.27 acres of parcel

1, tract 4, but its expectation was unfulfilled. Madison eventually filed suit in an attempt to obtain such release.

As of July 9, 1975, Madison had made all of the required mortgage payments on parcel 2, tract 2, and on the above-mentioned portions of parcel 1, tract 4 and parcel 2, tract 3. On July 9, 1975, after the mortgagees had refused Madison's offer to reconvey the properties to them, the general partners informed the mortgagees of the partnership's intention to abandon said 3 tracts. After that date, Madison made no further mortgage or property tax payments on these 3 tracts. As of July 9, 1975, each tract's outstanding mortgage balance and tax basis were as follows:

| Property | Mortgage balance | Tax basis |
|---|---|---|
| 252 acres of parcel 1, tract 4 ........... | $355,309.20 | $510,085.55 |
| Parcel 2, tract 2 (765.035 acres) ........ | 1,422,202.87 | 1,717,228.61 |
| 157.381 acres of parcel 2, tract 3 ...... | 268,367.85 | 284,470.92 |
| House ....................................... | 0 | 2,200.00 |

On September 2, 1975, Madison suffered a foreclosure and sale of parcel 1, tract 2 (including the building) and parcel 1, tract 3; Madison received no money from the sale. At the time of the foreclosure sale, the combined outstanding mortgage balances and tax basis for both tracts (including the building), were $571,780.13 and $753,903.50, respectively.

On October 7, 1975, the mortgagee of parcel 2, tract 2 obtained title thereto pursuant to a foreclosure. Madison did not receive any money from this foreclosure. At the time of the foreclosure, the total outstanding mortgage balance and tax basis were $1,422,202.87 and $1,717,228.61, respectively.

On its 1975 partnership return, Madison reported ordinary losses with respect to the 252 acres of parcel 1, tract 4, the 157.381 acres of parcel 2, tract 3, and all of parcel 2, tract 2, all of which Madison claimed were abandoned during 1975. Madison also reported a capital loss arising from the foreclosure and sale of parcel 1, tract 2.

## 1976

On February 6, 1976, Madison held another partnership meeting and the partnership concluded that, since the outstanding mortgage balances for parcel 1, tract 1 and parcel 2, tract 1 exceeded their respective fair market values, the

properties should be abandoned. Madison offered the mortgagees deeds in lieu of foreclosure, but they were refused.

As of March 5, 1976, Madison had made all required payments on the mortgage existing on parcel 1, tract 1 at the time this property was acquired. However, no payments had been made on the three purchase-money mortgages. On March 5, 1976, Madison informed the mortgagee of its intent to abandon the property. Madison did not make any mortgage or property tax payments on the property after that date. As of March 5, 1976, the outstanding mortgage balance and tax basis of parcel 1, tract 1 were $168,679.53 and $190,379.34, respectively.

On June 15, 1976, the mortgagee obtained title to 157.381 acres of parcel 2, tract 3 (including the house) pursuant to a foreclosure. (Madison had previously received a quitclaim deed releasing 41.41 acres of this property from the mortgagee.) Madison did not receive any money from this foreclosure. At the time of the foreclosure, the outstanding mortgage balance and tax basis of this tract were $268,367.88 and $286,670.92, respectively.

On July 10, 1976, the partners of Madison informed the mortgagee of parcel 2, tract 1, of Madison's intent to abandon that tract; Madison offered to voluntarily convey the property to the mortgagee but the offer was refused. As of July 10, 1976, all mortgage payments had been made and the outstanding nonrecourse mortgage balance and tax basis of the property were $352,248.40 and $446,133.68, respectively.

On August 24, 1976, the mortgagee of parcel 1, tract 1 obtained title to said property pursuant to a foreclosure. Madison received no money from this foreclosure. The outstanding mortgage balance and tax basis of this tract at the time of the foreclosure were $168,679.53 and $190,379.34, respectively.

On its 1976 return, Madison reported ordinary losses arising from claimed abandonments of parcel 1, tract 1 and parcel 2, tract 1 in the respective amounts of $52,638.73 and $165,478.79.

## 1977

On January 4, 1977, the mortgagee of parcel 1, tract 4 obtained title thereto pursuant to a foreclosure. Madison did

not receive any money from this foreclosure. On the date of the foreclosure, the outstanding mortgage balance and the tax basis of 252 acres of this tract were $355,309.20 and $510,085.55, respectively.

On October 20, 1977, the mortgagee of parcel 2, tract 1 obtained title thereto pursuant to a foreclosure. Madison did not receive any money from this foreclosure. On the date of the foreclosure, the outstanding mortgage balance and the tax basis of this tract were $352,248.40 and $446,133.68, respectively.

For the property tax year beginning January 1, 1975, Madison was listed on the tax rolls of the Morgan County, Ga., tax commissioner's office as the owner of record of all of the property which it had acquired between August and November of 1973. It is the practice of the Morgan County tax commissioner's office to issue only one notice to a party listed on the tax rolls as a property owner, combining assessments on all property for which he is listed as the owner. During October 1975, a tax notice due and payable December 20, 1975, was issued to Madison for the 1975 tax assessment.

Madison was listed as the owner of record of parcel 1, tract 1; parcel 1, tract 4; parcel 2, tract 1; and parcel 2, tract 3 on the property tax rolls of the Morgan County, Ga., tax commissioner's office for the property tax year beginning January 1, 1976. During October 1976, a property tax notice was issued to Madison for the 1976 property tax assessment, due and payable on December 20, 1976.

Madison was listed as the owner of record of parcel 2, tract 1 and parcel 1, tract 4 on the property tax rolls of the Morgan County tax commissioner's office for the property tax year beginning January 1, 1977. The property tax notice for the 1977 property tax assessment, due and payable on December 20, 1977, was issued to Madison during October, 1977.

Madison did not make any property tax payments during the years 1975, 1976, and 1977.

The amounts of Madison's loss on each respective tract of land were as follows:

Parcel 1, tract 1 (54,071 acres)
Basis...................................................... $190,379.34
Amount realized...................................... 168,679.53
Loss....................................................... 21,699.81

Parcel 1, tract 2 (334.486 acres with building)
and parcel 1, tract 3 (0.985 acres)
Basis...................................................... $753,903.50
Amount realized...................................... 571,780.13
Loss....................................................... 182,123.37

252 acres of parcel 1, tract 4 (300.270 acres)
Basis...................................................... $510,085.55
Amount realized...................................... 355,309.20
Loss....................................................... 154,776.35

Parcel 2, tract 1 (125.803 acres)
Basis...................................................... $446,133.68
Amount realized...................................... 352,248.40
Loss....................................................... 93,885.28

Parcel 2, tract 2 (765.035 acres)
Basis...................................................... $1,717,228.61
Amount realized...................................... 1,422,202.87
Loss....................................................... 295,025.74

157.381 acres with house of parcel 2, tract 3
(198.791 acres)
Basis...................................................... $286,670.92
Amount realized...................................... 268,367.88
Loss....................................................... 18,303.04

During the taxable year 1975, petitioners held a 3-percent interest (capital and profit/loss) in Madison. On their 1975 joint individual income tax return, petitioners reported a long-term capital loss and an ordinary loss from Madison in the amounts of $5,463.57 and $14,053.10, respectively.

During the taxable year 1976, petitioners held a 5.63-percent interest (capital and profit/loss) in Madison. On their 1976 joint individual income tax return, petitioners claimed an ordinary loss from Madison in the amount of $12,280.02.

In the statutory notice of deficiency, respondent determined that petitioners' claimed ordinary losses for 1975 and 1976 in the amounts of $14,053.10 and $12,280.02, respectively, were losses from the sale or exchange of capital assets and thus subject to the limitations on capital losses contained in sections 1211 and 1212.[1] Respondent determined deficiencies in petitioners' income taxes for 1975 and 1976 in the amounts of $2,770.07 and $2,312.07, respectively. The amounts of the deficiencies, as determined in the statutory notice, were computed on the basis of Madison's claimed losses of $868,673.04 as reported on its partnership information returns instead of the losses of $765,813.59 which it actually sustained. The increased deficiencies contained in respondent's amended answer result from this difference between the reported and actual losses and also from respondent's assertion of a new legal theory, namely, that the foreclosure sales and not the alleged abandonments constituted the loss realization events.

Petitioners reported their proportionate shares of losses from the Madison partnership on their 1975 and 1976 returns. The issues for decision involve the timing, characterization, and cause of the losses which Madison incurred as the result of abandonment or foreclosure of certain tracts of essentially undeveloped land. The partnership had acquired the land in an earlier year by a combination of cash payments and assumption of nonrecourse debt. The fact that Madison sustained the losses at some point is not disputed, nor is the amount thereof.

Petitioners argue that Madison effected abandonments of each of the 5 tracts and was accordingly entitled to report the losses as ordinary. Petitioners reason that the nonrecourse nature of the liabilities which attached to the property imports that Madison received no consideration upon the purported abandonments. Thus, in petitioners' view, the losses did not arise from any sale or exchange for purposes of the sections 1211 and 1212 capital loss limitations, but rather constituted an ordinary loss on a transaction entered into for investment under section 165. Under this argument, the loss realization event for each disposition of property was the alleged abandonment and not the subsequent foreclosure sale.

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, except as otherwise specifically indicated.

Respondent argues that the losses occurred as the result of the foreclosures, which constituted in each instance a sale or exchange, and consequently resulted in capital losses. Respondent argues in the alternative that, if the losses resulted from abandonment, a sale or exchange in each instance nevertheless occurred.

If the losses resulted from the steps taken by the Madison partnership to abandon the properties in question, the losses occurred in 1975 and 1976, the years before the Court. If, on the other hand, the losses did not occur until the foreclosures were perfected, then some of the losses did not occur until 1977, a year which is not before the Court, and the effect would be to deny petitioners the availability of some of the losses insofar as 1975 and 1976 are concerned.

In *Freeland v. Commissioner*, 74 T.C. 970, 982–983 (1980) (reviewed by the Court), we held that a "voluntary reconveyance of * * * property to the mortgagee for no monetary consideration (boot) was a sale within the meaning of sections 1211 and 1212 of the Code, even though [the mortgagor] had no personal obligation on the mortgage debt, the fair market value of the property at the time of the reconveyance was less than the unpaid balance due on the mortgage debt, and [the mortgagor] had received no tax benefits in the form of depreciation deductions with respect to the property while he held it. Consequently, [his] loss was a capital loss subject to the limitations of section 1211(b)." We pointed out that a sale or exchange occurred since the mortgagor is relieved of property which has a lien on it and is also relieved of the obligation to pay taxes and assessments against the property. There is no forgiveness of indebtedness, although there is a change in the mortgagor's balance sheet or net worth. He no longer has the liability to account for, nor does he have, the assets. We stated that "We believe the holdings of *Crane*[2] and subsequent cases decided in light of *Crane* mandate the conclusion that *relief* from indebtedness, even though there is no personal liability, is sufficient to support a sale or exchange." *Freeland v. Commissioner, supra* at 981 (emphasis in text).

It would serve no useful purpose to repeat here the lengthy

---

[2]*Crane v. Commissioner*, 331 U.S. 1 (1947).

discussion in *Freeland* of the decisional history leading to our conclusions there. We believe, however, that the rationale supporting the *Freeland* result is equally applicable in the case before us, for we can perceive of no logical distinction between the relief from indebtedness through voluntary reconveyance on the one hand and the rejected proffer of reconveyance on the other, as in the case before us.

*Freeland,* nevertheless, has its troubling aspects insofar as this case is concerned. We made the following statement in *Freeland v. Commissioner, supra* at 974:

> The parties have framed the issue in terms of abandonment, both parties implicitly agreeing that a loss sustained on abandonment is an ordinary one. Petitioner states that the issue to be decided is whether a disposition by abandonment constitutes a sale or exchange. Respondent concedes that an abandonment of property is not a disposition by sale or exchange, but argues that this disposition was the equivalent of a foreclosure sale rather than an abandonment.
>
> It appears that by reconveying the property to the seller, petitioner accomplished an abandonment under California law. See *Gerhard v. Stephens,* 442 P.2d 692, 69 Cal. Rept. 612 (1968), wherein it was held that, as a general rule, for there to be an abandonment, there must be an intent to abandon and one decisive and conclusive act to clearly indicate this intent, which the reconveyance accomplished here. But see *Commissioner v. Hoffman,* 117 F.2d 987 (2d Cir. 1941). But regardless of whether petitioner's intent and overt act of reconveyance qualified the reconveyance as an abandonment under California law, we are concerned here with whether the voluntary reconveyance, per se, constituted a sale or exchange within the meaning of section 1211(b)(1) of the Internal Revenue Code. See *Helvering v. Jones,* 120 F.2d 828 (8th Cir. 1941).

In the case before us, unlike the situation in *Freeland,* respondent does not concede that an abandonment of property is not a disposition by sale or exchange. Respondent argues that if the losses in question were not sustained as a result of the foreclosure sales, then Madison (and therefore petitioners as limited partners) sustained a long-term capital loss in the taxable year of its alleged abandonment of each of the 5 tracts, because each alleged abandonment constituted a sale or exchange.

We agree with respondent's alternative position in this case. While our decision in *Freeland* was based upon the mortgagor's relief from indebtedness as a result of the voluntary reconveyance in lieu of foreclosure, and not the consequent abandonment under California law, we think the same result

should obtain where the relief from indebtedness is the result of abandonment of the property by the mortgagor. All of the consequences, which flow from voluntary reconveyance where property is subject to nonrecourse debt, likewise flow from abandonment of property subject to nonrecourse debt: the mortgagor in each case is relieved of encumbered property and also is relieved of the obligations to pay taxes and assessments against the property.[3]

Respondent also asseverates that Madison sustained the losses as a result of the foreclosures and not through abandonments, as asserted by petitioner. Were it not for the matter of the taxable years in which the losses occurred, the abandonment question would be completely moot, given our holding that a sale or exchange occurred in either event. We believe, however, that Madison effectively abandoned the property resulting in the stipulated losses in 1975 and 1976, the years in question.

The facts are quite similar to those in *Hoffman v. Commissioner*, 40 B.T.A. 459 (1939), affd. per curiam 117 F.2d 987 (2d Cir. 1941). In *Hoffman*, the owners refused to pay interest on a nonrecourse mortgage and to pay back taxes and water rents on the property. They notified the mortgagees of their intent to abandon the property, cancelled the insurance on the property, and cancelled their contracts with the local utilities. The mortgage was greatly in excess of the value of the property and there was no reasonable hope that the mortgagor-taxpayers' equity would ever again have any value. The Board observed that the taxpayers "were moved [to abandon the property] by their knowledge that their interest was no longer of any value and, if retained, would require them to make additional expenditures which they deemed entirely unwise." *Hoffman v. Commissioner*, supra at 463.

The Board further held that neither the statute (section 23(e)(2) of the Revenue Act of 1934, now section 165(c)(2)) nor such cases as *Lucas v. American Code Co.*, 280 U.S. 445 (1930), *Rhodes v. Commissioner*, 100 F.2d 966 (6th Cir. 1939), revg. 34

---

[3]In *Hope v. Commissioner*, T.C. Memo. 1981–324 (June 24, 1981), a partnership executed a written release to the mortgagee of certain property held subject to nonrecourse promissory notes. We held such release to be tantamount to a voluntary reconveyance even though the partnership did not execute deeds, thereby resulting in a sale or exchange.

B.T.A. 212 (1936), and *Denman v. Brumback*, 58 F.2d 128 (6th Cir. 1932), require the loss of title to establish the loss where, as here, the loss is reasonably certain in fact and ascertainable in amount.[4] We have found no subsequent cases requiring a different result.

In a more recent case, *A. J. Industries, Inc. v. United States*, 503 F.2d 660, 670 (9th Cir. 1974), the court made an exhaustive survey of the law respecting abandonment for Federal income tax purposes (particularly as applied to the abandonment of an intangible asset), and concluded, among other things, that "The subjective judgment of the taxpayer * * * as to whether the business assets [of the taxpayer] will in the future have value is entitled to great weight and a court is not justified in substituting its business judgment for a reasonable, well-founded judgment of the taxpayer. * * * It has been repeatedly held that in order for a loss of an intangible asset to be sustained and to be deductible, there must be (1) an intention on the part of the owner to abandon the asset, and (2) an affirmative act of abandonment."[5] We subscribe to the court's reasoning and believe that it applies with equal force to the abandonment of real property. We further believe that a taxpayer should not be denied an abandonment loss because of the technicalities of title. Nor should the availability of the loss be dependent upon the act, or failure to act, of the mortgagee in instituting foreclosure proceedings.

In this case, Madison clearly took all necessary steps to abandon the respective properties for which the losses are claimed for 1975 and 1976. In each case, the partners met and determined that the properties had become worthless as the

---

[4]The regulations, albeit in a different context, infer as much. Sec. 1.167(a)–8(a)(4), Income Tax Regs., provides in part as follows:

"Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition."

[5]In note 6b of its opinion, the Circuit Court cited with apparent approval the decision in *Denman v. Brumback*, 58 F.2d 128 (6th Cir. 1932); *Rhodes v. Commissioner*, 100 F.2d 966 (1939); and *Hoffman v. Commissioner*, 40 B.T.A. 459 (6th Cir. 1939) affd. per curiam 117 F.2d 987 (2d Cir. 1941), all dealing with abandonment of real property. There, in the words of the court, "the courts regarded the taxpayer's conduct as the practical equivalent of abandonment even though title had not been disposed of."

result of the mortgages substantially exceeding fair market value of the properties. In order to terminate further expenditures in connection with properties which in Madison's judgment would have no worth to the partners at any time in the foreseeable future, the properties were formally tendered to the mortgagees in lieu of foreclosure, and the partners discontinued payments on the mortgages and payment of real property taxes. The fact that the mortgagees for their own reasons preferred to go through the formalities of foreclosure, some of which actions were not completed until 1977, can have no effect upon the years in which the Madison partners sustained their losses through abandonment.

Respondent strenuously argues that under Georgia law the partners were personally liable for real property taxes, which liability was not extinguished until foreclosure was completed. Respondent states in his brief that "Madison's liability for property taxes places the partnership in exactly the same position as if it were trying to abandon recourse mortgages." While respondent does not pursue the line of reasoning thus suggested, at least one court has held that the abandonment of property subject to a *recourse* debt does not result in loss until the foreclosure sale because, since the possibility of a deficiency judgment exists, the amount of the loss cannot be fixed until the sale takes place. *Commissioner v. Green*, 126 F.2d 70 (3d Cir. 1942). See also discussion in Cleveland, "Foreclosure, Abandonment, and Settlement: The Tax Effects on Mortgagors," 9 Tax Advisor 68, 72 (Feb. 1978). Under this line of reasoning, assuming arguendo personal liability under Georgia law for real property taxes, respondent presumably might have argued that the amount of Madison's loss could not be fixed until completion of foreclosure, at which time any further property tax liability would have ended and the amount of the loss determined.

While we have grave doubts as to the correctness of respondent's analysis of Georgia law regarding the taxation of real property, we need not dwell upon it since the parties have stipulated the exact amount of the losses sustained. As already stated, only the characterization and timing of the losses remain in issue. Any argument based therefore upon a theory of personal liability for real property tax loses all of its force in this case.

In *Hoffman v. Commissioner, supra,* the Board found, without discussion or analysis, that the taxpayers-mortgagors sustained an ordinary loss as a result of the abandonment. In a brief per curiam opinion, the Second Circuit merely affirmed the Board of Tax Appeals on the abandonment issue, without discussing the nature of the loss. *Commissioner v. Hoffman,* 117 F.2d 987 (2d Cir. 1941), affg. 40 B.T.A. 459 (1939). *Hoffman* was, of course, decided many years before the seminal case of *Crane v. Commissioner,* 331 U.S. 1 (1947), and the myriad cases which followed, many of which are cited and analyzed in our opinion in *Freeland v. Commissioner, supra.* The question of whether a sale or exchange, rather than a mere disposition, might have occurred by reason of abandonment of property subject to nonrecourse debt was never considered in *Hoffman.* Accordingly, to the extent *Hoffman* holds that a loss resulting from abandonment of real property subject to nonrecourse debt is an ordinary loss rather than a capital loss, it will no longer be followed.

*Decision will be entered under Rule 155.*

Reviewed by the Court.