[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11042

_____

Agency No. 019797-13

HARVEY L. TUCKER,

Petitioner-Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee,

_____

Petition for Review of a Decision of the
U.S. Tax Court

_____

(November 21, 2016)

Before TJOFLAT and HULL, Circuit Judges, and MENDOZA,[*] District Judge.

HULL, Circuit Judge:

_____

[*] Honorable Carlos Eduardo Mendoza, United States District Judge, for the Middle
District of Florida, sitting by designation.

Appellant Harvey L. Tucker petitions for review of the United States Tax Court's decision upholding the Commissioner of Internal Revenue's (the "Commissioner") determination that he owes income tax deficiencies and related penalties[1] for 2004, 2005, and 2006.  After review and oral argument, we affirm.

## I.      FACTUAL BACKGROUND

### A.    Tucker's Real Estate Development Company

At all times relevant to this appeal, Tucker was the president, director, and sole shareholder of a Florida "S" corporation[2] called Paragon Homes Corporation ("Paragon"), which was in the business of real estate acquisition, development, and sales.  Paragon was incorporated in November 1997.  Paragon filed annual reports in 2008, 2010, and 2011.  Paragon remained an active corporation until September 28, 2012.  Paragon owned several properties in Hillsborough County, Florida, including multiacre tracts, platted subdivisions, lots, and single-family homes.  At the beginning of 2008, Paragon was a solvent company meeting its payroll and paying its mortgage obligations, rent, insurance premiums, real estate taxes, and utility bills.

---

[1] The parties dispute whether Tucker has waived his argument pertaining to the penalties imposed by the Tax Court.  Regardless, Tucker concedes that, should we rule against him on the loss-deduction issue, we need not reach the penalty issue.  Accordingly, we do not address it.

[2] Paragon elected to be an "S" corporation for federal income tax purposes.  This simply means that the tax attributes of the corporation pass through to the shareholders.  See I.R.C. §§ 1366(a), 6037(a).

In order to obtain the funds to purchase real property, Paragon took out mortgages with several banks, including Platinum Bank ("Platinum"), Branch Banking & Trust Co. ("BB&T"), Wachovia Bank ("Wachovia"), and Fidelity Bank ("Fidelity"). All mortgages were with recourse to Paragon. Tucker also personally guaranteed the mortgage loans on Paragon's properties.

## B.    The 2008 Housing Market Crash

In 2007 and 2008, the residential real estate market in Hillsborough County went into sharp decline, with annual housing starts down 79% from their peak in June 2006, annual closings down 65% from that date, and with a 36% decline in median home price for a single-family unit.

According to Tucker's trial testimony, Paragon was out of business and insolvent by the end of 2008. Paragon had no sales and no revenue. As a result, Paragon "cease[d] . . . operations" at the end of 2008—it closed its office, dismissed its employees, and stopped making payments on its mortgages, insurance premiums, and taxes. At the close of 2008, Paragon had little over $12,000 in its bank accounts. In Tucker's mind, Paragon's real estate inventory— individually and in the aggregate—was "worthless" as of December 31, 2008, because "prices had fallen through the floor. There was no demand and we couldn't generate any sales. So, Paragon Homes . . . had no value, had a negative value."

## C.    Paragon's Properties

According to the record evidence, Paragon owned (and owed mortgages on) the following properties[3] as of December 31, 2008:

| Property Name | Fair Market Value ("FMV")[4] | Balance due on mortgages[5] | Bank that owned the mortgage |
|---|---|---|---|
| Long Pond / Hunter's Lake | $1,250,000 | $1,859,725 | Platinum |
| Culbreath Estates (3 properties) | $510,000[6] (total) | $591,244 (total) | Platinum |
| Massaro II / Meadow Chase | $475,000 | $643,500 | BB&T |
| Amberwave Estates—Lot 1 | $127,500 | $115,000 | BB&T |
| Walden Reserve— Lot 11 / Block 2 | $270,000 | $270,113 | BB&T |
| Walden Reserve— Lot 15 / Block 2 | $270,000 | $206,478 | Fidelity |
| Walden Reserve— Lot 3  / Block 2 | $270,000 | $192,524 | Fidelity |

---

[3] On August 29, 2008, Paragon sold a parcel in Hillsborough County identified as the Huntley property for $735,000, a contract price less than the mortgage on the property. The lender, Platinum, held the mortgage on that property, but it released the mortgage to permit the sale to proceed. The balance of the mortgage was extinguished as part of the parties' settlement agreement. Neither Tucker nor the Commissioner included the Huntley property in the determination of Paragon's inventory as of December 31, 2008.

[4] The FMV for each property was determined by Jamie Myers, a real estate appraiser and Tucker's expert witness at trial. Myers also gave his opinion that, at the end of 2008, there was value to all of these properties and "some demand" for the properties.

[5] Amounts are rounded to the nearest dollar. The "balance due" figure represents only the outstanding mortgage and does not include taxes, interest, fees, etc.

[6] In his brief, Tucker lists these properties as having a total FMV of $520,000, but the record evidence shows that the three properties were given the following FMVs: $310,000, $105,000, and $95,000, which total $510,000.

4

| Walden Reserve—Lot 8 / Block 2 and Walden Reserve Vacant Lots | $1,180,000 (total) | $2,126,158 (total) | Fidelity |
|---|---|---|---|
| Misty Glen—Lot 5 / Block B | $270,000 | $223,000 | Fidelity |
| Walden Reserve—Lot 19 / Block 1 | $260,000 | $198,298 | Wachovia |
| Misty Glen—Lot 2 / Block B | $307,000 | $293,739 | Wachovia |
| Misty Glen (Windhorst) | $620,000 | $984,409 | Wachovia |
| McMullen Road / Forest Glen | $950,000 | $887,250 | Wachovia |

## D.    Paragon Disposes of its Properties

Even after Paragon was allegedly shuttered at the end of 2008, Tucker was aware of his continuing obligations on the mortgages.  He claimed that, at the end of 2008, he owed more than $2 million on Paragon's "underwater" properties.

In the summer of 2009, Tucker transferred funds to Paragon, a move he later called a "disastrous mistake."  Specifically, bank records for Paragon's business account show deposits / credits of $85,028 in June 2009; $70,000 in July 2009; $460,000 in August 2009; and $772,525.81 in September 2009.  Tucker testified that he did this in order to use Paragon as a "conduit" to discharge his liabilities and "protect" himself.  Tucker testified that he wished to complete and sell homes under construction in order to pay off the mortgages and limit his personal losses.

According to Tucker, he continued acting throughout 2009 and 2010 solely to mitigate his personal losses. Tucker testified that this infusion of money was not a capital contribution to Paragon, nor did he on any occasion act to save or protect Paragon.

The record shows that the properties and mortgages were disposed of as follows:

1.  Properties Secured by Mortgages from Platinum

On October 27, 2008, Platinum filed a foreclosure lawsuit against Tucker and Paragon in the Circuit Court for Hillsborough County, Florida. On February 11, 2009, a final judgment of foreclosure was entered in favor of Platinum. On October 12, 2009, Platinum, Paragon, and Tucker entered into a Mutual General Release, which relieved Tucker and Paragon of all liabilities on the properties in exchange for a $275,000 payment. Tucker testified that he alone paid the settlement amount.

2.  Properties Secured by Mortgages from BB&T

On September 24, 2008, BB&T filed a foreclosure lawsuit against Tucker and Paragon in the Circuit Court for Hillsborough County, Florida. On March 4, 2009, a final judgment of foreclosure was entered in favor of BB&T. On September 9, 2009, BB&T, Paragon, and Tucker entered into a Settlement Agreement and Release of Claims, which relieved Tucker and Paragon of all

6

liabilities on the properties, as well as Paragon's line of credit with BB&T, in exchange for a $160,000 payment.  Tucker testified that he alone paid the settlement amount.  Yet Paragon's business account reflects a $160,000 check drawn on Paragon's account on September 4, 2009.

### 3.  Properties Secured by Mortgages from Fidelity

On May 12, 2009, Tucker, through Paragon, signed and filed a Notice of Commencement as to Walden Reserve—Lot 8 / Block 2, identifying Paragon as the owner and contractor for a single-family residence to be built on this property. As Tucker explained, this was an attempt "to finish the [construction of the property] to put [it] in a saleable condition to help mitigate my damages."  Tucker stated that the Notice of Commencement was in Paragon's name because Paragon was the named owner of the property.

On September 25, 2009, another lot in Walden Reserve (Lot 15 / Block 2) was sold for $239,000, satisfying the mortgage obligation on that property.  On October 29, 2009, Misty Glen—Lot 5 / Block B was sold for $254,000, satisfying the mortgage obligation on that property.

On March 1, 2010, Fidelity filed a foreclosure suit against Tucker and Paragon in the Circuit Court for Hillsborough County, Florida, seeking foreclosure

on 33 lots in a tract identified as Walden Reserve.  On February 23, 2011, a final judgment of foreclosure was entered in favor of Fidelity.[7]

On July 28, 2010, Walden Reserve—Lot 3, Block 2 was sold for $210,000, satisfying the mortgage obligation on that property.

4.  Properties Secured by Mortgages from Wachovia

In September 2010, Wells Fargo Bank, as successor to Wachovia, filed a foreclosure suit against Tucker and Paragon, as to all properties except Misty Glen—Lot 2, Block B.

On October 8, 2010:  Paragon undertook development of Walden Reserve—Lot 19, Block 1.  Tucker, through Paragon, signed and filed a Notice of Commencement, identifying Paragon as the owner and contractor for a single-family residence to be built on this property.

## E.    Tucker Transfers Funds Out of Paragon

On November 30, 2009, there was a balance of $839,744.58 in Paragon's bank account.  In December 2009, on the advice of his counsel, Tucker established Harvey L. Tucker Family, LLLP, and transferred $358,255.63 from Paragon's bank account to the LLLP.  He also transferred a little over $400,000 from the Paragon account to himself, and he used these funds to purchase a variable annuity

---

[7] The judgment lists an effective date of August 19, 2009.

life insurance policy.  Tucker testified that he did this to protect himself from "[b]anks and other creditors."

## F.    The Federal Income Tax Returns

On its 2008 federal income tax return, Paragon reported a loss of approximately $10.8 million.  Of this, approximately $8,928,845 was attributable to a "write down" of Paragon's real estate inventory to current market value as of December 31, 2008.[8]  Tucker then claimed a flow-through loss from Paragon of roughly $6.78 million on his individual 2008 income tax return.  As a result of this loss, Tucker reported a 2008 net operating loss ("NOL") of more than $6.7 million.

Tucker then elected to carry the 2008 NOL back to tax years 2003, 2004, 2005, 2006, and 2007.[9]  Tucker sought a refund totaling almost $2 million for tax years 2003, 2004, 2005, and 2006 based on the loss carrybacks.

## G.    The Commissioner Issues a Notice of Deficiency to Tucker

The Commissioner conducted an audit and concluded that Paragon's allowable loss for 2008 was, in actuality, only $1.5 million.  As a result, on June 4,

---

[8] The remainder of the claimed loss consisted of interest expense deductions, depreciation deductions, and a deduction for financial fees.  Tucker has not contested the Tax Court's disallowance of these other deductions.  Thus, Tucker has waived any claim with respect to these items.  See Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1306 (11th Cir. 2012).

[9] In general, a net operating loss may be carried back only to the two taxable years preceding the loss year.  I.R.C. § 172(b)(1)(A)(i).  A special rule, however, applied to net operating losses incurred during the 2008 taxable year that allowed taxpayers to elect to carry back a 2008 net operating loss attributable to an eligible small business for a period of three to five years instead of the usual two.  The Worker, Homeownership, and Business Assistance Act of 2009, Pub. L. No. 111-92, § 13(a), Nov. 6, 2009, 123 Stat. 2984, 2992.

2013, the Commissioner issued a Notice of Deficiency to Tucker, indicating that it had disallowed his claimed NOL carrybacks for 2004, 2005, and 2006. The Notice of Deficiency indicated that Tucker owed the following amounts:

| Year | Tax Deficiency | Penalty (I.R.C. § 6662(a)) |
|------|----------------|----------------------------|
| 2004 | $610,541.00 | $122,108.20 |
| 2005 | $714,979.00 | $142,995.80 |
| 2006 | $152,851.00 | $30,570.20 |

## II.   PROCEDURAL HISTORY

On August 26, 2013, Tucker filed a petition with the Tax Court challenging the Commissioner's Notice of Deficiency. On December 9, 2014, the Tax Court held a one-day bench trial.

On September 22, 2015, the Tax Court released its memorandum opinion. The Tax Court explained that whether Tucker's NOL carrybacks were proper depended on whether the Commissioner correctly disallowed Paragon's claimed deduction under I.R.C. § 165(a) and its accompanying regulation, which allow deductions for losses stemming from "closed and completed transactions," which may include abandonment of an asset or an asset becoming worthless. The Tax Court stated the general rule that, when a taxpayer's real property is secured by a

10

recourse obligation,[10] the taxpayer is not entitled to a loss deduction until the year of the foreclosure sale, regardless of abandonment or worthlessness. The Tax Court noted Tucker's argument that Paragon's investments in its properties were "closed and completed" at the end of 2008 because it was "impossible" for Paragon to pay a deficiency judgment, and that any money later invested in the properties came from Tucker's own pocket in an effort to mitigate his own personal exposure. The Tax Court summarized that, "[i]n essence [Tucker] argues that the facts and circumstances of his case distinguish it from other cases involving recourse loans [and that, therefore,] the general rule . . . should not apply."

In support of this argument, as the Tax Court noted, Tucker relied on Treasury Reg. § 1.165-1(d)(2). But the Tax Court rejected this argument because it "confuses the test for 'closed and completed transactions' with respect to casualty losses and losses on land due to abandonment and worthlessness of property" and "mistakes the taxpayer for the banks." The Tax Court also rejected Tucker's argument that Paragon could not pay a deficiency judgment as "simply not true," pointing to the funds that Paragon had in its accounts during 2009.

---

[10] A recourse obligation or debt is one guaranteed by a third party such that the lender would have recourse to seek payment from this third party in the event of default. See Laney v. Comm'r, 674 F.2d 342, 349 (5th Cir. Unit A 1982). There is no dispute in this case that the mortgages securing the properties were recourse debts.

The Tax Court also determined that "the record does not indicate that any of Paragon's properties were abandoned or became worthless." It determined, instead, that Paragon's "subsequent attempts in 2009 and 2010 to sell the properties, construct homes, and settle claims with the banks show that Paragon did not abandon the properties." Furthermore, the properties were not worthless to Paragon at the end of 2008 because "the properties could be used to reduce Paragon's liability exposure for a deficiency judgment." In addition, Tucker's own expert witness testified that the properties had some value and there was "some demand" for the properties at the end of 2008. Thus, the Tax Court concluded that Tucker had not met his burden of establishing the abandonment or worthlessness of the properties by the end of 2008.[11]

On February 3, 2016, the Tax Court entered a formal decision imposing the following deficiencies and penalties against Tucker:

| Year | Tax Deficiency | Penalty (I.R.C. § 6662(a)) |
| --- | --- | --- |
| 2004 | $539,666.00 | $107,933.20 |
| 2005 | $714,979.00 | $142,995.80 |
| 2006 | $152,851.00 | $30,570.20 |

---

[11] The Tax Court also affirmed the Commissioner's disallowance of additional deductions and the imposition of penalties.

Tucker timely appealed the Tax Court's determination to this Court.

### III.   DISCUSSION

We review the Tax Court's legal conclusions de novo, and its factual findings for clear error.  Gustashaw v. Comm'r, 696 F.3d 1124, 1134 (11th Cir. 2012).  The Commissioner's determination of a deficiency is presumed correct, and the taxpayer has the burden of proving otherwise.  Welch v. Helvering, 290 U.S. 111, 115, 54 S. Ct. 8, 9 (1933).  Additionally, deductions are a matter of legislative grace, and the taxpayer has the burden of proving his entitlement to any claimed deduction.  C. A. White Trucking Co., Inc. v. Comm'r, 601 F.2d 867, 869 (5th Cir. 1979).

Section 165(a) of the Internal Revenue Code allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise."  I.R.C. § 165(a).  The accompanying regulation states, "[t]o be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and . . . actually sustained during the taxable year."  Treas. Reg. § 1.165–1(b); see also id. § 1.165-1(d)(1).  In most cases, a "closed and completed transaction[]" will occur upon a sale or other disposition of the property, but this requirement may also be satisfied if the taxpayer abandons the asset or the asset becomes worthless.  Proesel v. Comm'r, 77 T.C. 992, 1005-06 (1981).  "Abandonment" and "worthlessness" are separate

13

and distinct grounds, either one of which may give rise to a deduction under § 165(a). Echols v. Comm'r, 935 F.2d 703, 706 (5th Cir. 1991).

## A.    Paragon[12] Did Not Abandon the Properties in 2008

To show abandonment, the taxpayer must demonstrate both "an intention to abandon and some act evidencing that intention." Dezendorf v. Comm'r, 312 F.2d 95, 96 (5th Cir. 1963); see also Echols, 935 F.2d at 707 ("[T]he abandoning party must manifest an intent to abandon by some overt act or statement reasonably calculated to give a third party notice of the abandonment."); Middleton v. Comm'r, 77 T.C. 310, 322 (1981), (writing that abandonment requires (1) an intention on the part of the owner to abandon the asset; and (2) an affirmative act of abandonment), aff'd 693 F.2d 124 (11th Cir. 1982). Additionally, the abandonment must occur in the tax year for which the deduction is claimed. Dezendorf, 312 F.2d at 96. Determinations regarding the existence and timing of an abandonment are issues of fact. L & C Springs Assocs. v. Comm'r, 188 F.3d 866, 870 (7th Cir. 1999).

Here, Paragon points to the fact that it had closed its office, dismissed its employees, and stopped making payments on its obligations by December 31, 2008, as evidence of its abandonment. The parties dispute whether cessation of

---

[12] As explained above, Tucker's NOL carrybacks stem from Paragon's claimed $10.8 million loss in 2008, which in turn relied on a massive write down of the FMV of its properties on December 31, 2008. Accordingly, as the Tax Court noted, the issue is Paragon's claimed § 165(a) loss, and the operative question is whether Paragon (not Tucker) abandoned the properties and/or whether the properties were worthless to Paragon by the end of 2008.

14

business operations is itself enough to show abandonment. We need not decide this issue, however, because the Tax Court's finding that "the record does not indicate that any of Paragon's properties were abandoned" by the end of 2008 was not clearly erroneous. See Gustashaw, 696 F.3d at 1134.

The record demonstrates that Paragon continued to develop and sell the properties throughout 2009 and 2010. This is evidenced by the fact that two properties were sold in September and October 2009, another property was sold in July 2010, and Paragon undertook construction of two homes, as evidenced by the Notices of Commencement that were filed on May 12, 2009, and October 8, 2010. Tucker also funneled more than $800,000 of his personal money into Paragon's business account in order to facilitate construction on the properties. And, unlike the taxpayers in Middleton, Paragon never offered to reconvey the properties back to the mortgagees in lieu of foreclosure. See 77 T.C. at 322-23. Instead, Paragon signed settlement agreements with Platinum and BB&T in late 2009. Thus, Paragon's overt acts did not evidence an intention to abandon the properties. See Dezendorf, 312 F.2d at 96; Middleton, 77 T.C. at 322.

We are cognizant of Tucker's argument that all of these actions were intended to protect himself from his creditors and personal obligations on the mortgages, and that he did not act to protect or save Paragon. However, he has not pointed us to any cases supporting his argument that his subjective intention to act

15

purely for his own protection is sufficient to meet his burden.[13]  And his argument that Paragon was essentially defunct and out of business by the end of 2008 is belied by the record evidence demonstrating that Paragon continued to file reports with the State of Florida after December 31, 2008, it signed the settlement agreements with Platinum and BB&T, it was listed as the owner/builder on the Notices of Commencement, and it was listed as the "seller" on the realty sales documents.  Under these circumstances, the Tax Court did not clearly err in determining that Paragon did not abandon the properties in 2008.

## B.    The Properties Did Not Become Worthless to Paragon in 2008

To receive a deduction for "worthlessness," a taxpayer must demonstrate "his subjective determination of worthlessness in a given year, coupled with a showing that in such year the asset in question is in fact essentially valueless." Echols, 935 F.2d at 708.  The requirement of worthlessness is a "de minimus rule that the taxpayer does not have to prove that a given asset is absolutely, positively without any value whatsoever." Id. at 708 n.2.  Transfer of title is not a prerequisite to a finding of either abandonment or worthlessness. Id. at 706.  Further, while a taxpayer need not be "an incorrigible optimist in his determination

---

[13] It is true that the Tax Court has previously written that, where a taxpayer's interest in a partnership became worthless in a given year, the taxpayer could take a § 165(a) deduction in that year, even though the taxpayer continued to contribute funds to the partnership "only to minimize its own losses." Tejon Ranch Co. & Subsidiaries v. Comm'r, 49 T.C.M. (CCH) 1357 (1985).  Tucker did not cite this case in his briefs and, in any event, it is distinguishable because it dealt with the worthlessness of a partnership interest, not the alleged worthlessness of a piece of real property.

16

of when property becomes worthless, a mere decline, diminution, or shrinkage in value is not sufficient to establish a loss." Proesel, 77 T.C. at 1006. The question of worthlessness is "peculiarly one of fact" in which the petitioner bears the burden of proof. Id.; see also Boehm v. Comm'r, 326 U.S. 287, 293, 66 S. Ct. 120, 124 (1945) (stating that the question of whether an asset became worthless during a given taxable year "is purely a question of fact to be determined in the first instance by the Tax Court.").

Tucker and the Commissioner agree on the general rule that, in the case of recourse debts, the loss deduction must be taken in the year that the foreclosure sale occurs, regardless of whether the property was abandoned by or became worthless to the mortgagor in a prior year. See Helvering v. Hammel, 311 U.S. 504, 512, 61 S. Ct. 368, 372 (1941) (holding that the foreclosure sale was the "definitive event" establishing the taxpayers' loss); George v. United States, 124 F.3d 216 (10th Cir. 1997) (unpublished table decision) (determining, in the context of a recourse loan, that the taxpayer was entitled to a deduction on the loss from real property in the year in which it was sold at a foreclosure sale, not in the year in which it was abandoned and/or became worthless to him); Comm'r v. Green, 126 F.2d 70, 71-72 (3d Cir. 1942) (concluding that taxpayers could not deduct their loss on property secured by a recourse obligation in the year they allegedly

17

abandoned the property; instead, they must take the loss deduction in the year that the foreclosure sale occurred).

The Third Circuit in Green explained whether the mortgage at issue was a recourse mortgage was of "fundamental importance" to resolving the case. 126 F.2d at 72. That is because where the mortgagor retains liability for the debt, "the property continues until [the] foreclosure sale to have some value which, when determined by the sale, bears directly upon the extent of the owner's liability for a deficiency judgment." Id.

Tucker attempts to evade this general rule by relying on a novel interpretation of Treas. Reg. § 1.165-1(d). That regulation provides:

> A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year.

Treas. Reg. § 1.165-1(d)(1). The regulation then goes on to distinguish between instances where the loss is covered by a claim for reimbursement "to which there is a reasonable prospect of recovery" and losses that are not covered by such claims. See id. § 1.165-1(d)(2)(i)-(iii). Where there exists a claim with a reasonable prospect of recovery, "no portion of the loss . . . may be . . . sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received." See id. § 1.165-1(d)(2)(i). Where such a

18

claim does not exist, however, the loss may be sustained during the taxable year "in which the casualty or other event occurs." See id. § 1.165-1(d)(2)(ii).

By way of illustration, the regulation gives the following examples: Suppose a property worth $10,000 is completely destroyed in a fire in 1961, and the taxpayer's only claim for reimbursement consists of an insurance claim for $8,000, which claim is settled in 1962. Id. The taxpayer would then sustain a loss of $2,000 in 1961 under § 1.165-1(d)(2)(ii). Id. If, on the other hand, the taxpayer's car were completely destroyed in 1961 due to the negligence of another person, and there exists a reasonable prospect of recovery on a claim for the full value of the car against that other driver, the taxpayer would not sustain the loss "until the taxable year in which the claim is adjudicated or otherwise settled" under § 1.165-1(d)(2)(i). Id.

Tucker argues that, because the regulation authorizes the loss event to be a "closed and completed transaction" in the year the loss occurred where there is no claim with a reasonable prospect of recovery when considering whether a taxpayer will receive additional money, the inverse must also be true: certain loss events can constitute a "closed and completed transaction" when determining whether the taxpayer will pay additional monies. Further, by the end of 2008, there was "no reasonable prospect" that Paragon would be able to pay a deficiency judgment. Tucker concedes that the regulation nominally applies to casualty losses, but he

19

stresses that the regulation also encompasses "other event[s] . . . which may result in a loss." He claims that the 2008 market crash was just such an "other event."

There is support for Tucker's contention that market events can sufficiently "fix" a loss such that the deduction may be taken in the year that the loss occurs. See Echols, 935 F.2d at 705-08; Helvering v. Gordon, 134 F.2d 685, 686-89 (4th Cir. 1943); Rhodes v. Comm'r, 100 F.2d 966, 970 (6th Cir. 1939); Denman v. Brumback, 58 F.2d 128, 129 (6th Cir. 1932); Tejon Ranch Co. & Subsidiaries v. Comm'r, 49 T.C.M. (CCH) 1357 (1985); Middleton, 77 T.C. at 320-24. None of these cases, however, involved recourse loans or a nominally defunct business that continued to develop and sell the allegedly worthless asset after its alleged dissolution.

Moreover, Tucker has pointed us to no case law supporting his tortured and novel reading of the regulation. The thrust of the regulation is that a taxpayer may only claim a deduction under § 165(a) in the year that the amount of the loss becomes readily ascertainable. See Treas. Reg. § 1.165-1(d)(2). Here, the total losses to Paragon were not ascertainable or fixed at the end of 2008. None of the homes had been formally foreclosed upon or sold. Further, in the event of foreclosure, the banks would have recourse both to Paragon and to Tucker personally. As the case law makes clear, in the case of a recourse debt, the amount of the loss is not readily ascertainable until the foreclosure sale because the

20

property's value is directly linked to the extent of the owner's liability on a deficiency judgment.  Green, 126 F.2d at 72.

Tucker counters that Paragon would not have owed anything in a default judgment because it was insolvent and out of business on December 31, 2008.  But the Tax Court made a finding of fact that this assertion was not true.  The record evidence amply supports this finding, along with the finding that the properties were not worthless to Paragon at the end of 2008.

It is common sense that, if the properties could be sold to satisfy the mortgages, used as consideration in a settlement, or updated to increase the value (all of which actually occurred), then Paragon's liability on the mortgage debts would be reduced.  This reduction has value.  Further, while it is not required that the assets be "absolutely, positively without any value whatsoever," Tucker's own expert witness testified that the properties had some value and there was "some demand" for the properties at the end of 2008.  Echols, 935 F.2d at 708 n.2.  This conclusion does not, as Tucker contends, mean that "property is never worthless regardless of the encumbrances where it has any intrinsic value."  Such a holding would be contrary to case law and, indeed, the Tax Court acknowledged that a § 165(a) deduction based on worthlessness "requires worthlessness of the taxpayer's equity in the property."  See Echols, 935 F.2d at 705-08; Gordon, 134 F.2d at 687-89; Middleton, 77 T.C. at 320-24.  The Tax Court merely concluded

21

that, in this case, the properties retained enough value to avoid being "worthless" within the meaning of § 165(a).

Finally, the Tax Court did not clearly err in determining that a deficiency judgment against Paragon would not be "impossible" given the funds flowing in and out of Paragon's bank account in 2009. Though this money came from Tucker in a purported attempt to use Paragon as a "conduit" to cut his own losses, a move that Tucker now acknowledges was a "disastrous mistake," his actions demonstrate that a deficiency judgment against Paragon would have been possible after the foreclosure sales. Taxpayers cannot have it both ways—they cannot both freely use a business to settle debts and sell assets and then claim that the business was defunct the whole while.

Accordingly, the Tax Court properly determined that Tucker had not met his burden of demonstrating that the Commissioner's disallowance of the § 165(a) loss deduction was incorrect.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the decision of the Tax Court.

**AFFIRMED.**

22